No. 33,184

MINNIE SCHULER, *Appellee,* v. JULIUS REHBERG, Administrator of the Estate of Herman Rehberg, Deceased; JULIUS REHBERG, W. F. REHBERG, MATILDA LOUISE MARKLEY, EMMA F. REHBERG, OLLIE McFADDEN, NEVA BOARDMAN and ANNA REHBERG, *Appellants.*

(64 P. 2d 571)

Opinion filed January 23, 1937.

*L. A. McNalley* and *F. D. Boyce,* both of Minneapolis, for the appellants.

*Z. C. Millikin* and *W. C. Millikin,* both of Salina, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for the specific performance of an alleged oral contract by which, in consideration of certain services performed by plaintiff for Herman Rehberg, he was to leave a certain farm to her at his death. It was alleged the services were fully performed by plaintiff and that Rehberg died intestate without having carried out the contract on his part. His administrator and heirs at law were made defendants. The trial was to the court, with the aid of an advisory jury, which made findings of fact by answering special questions. The court adopted as its own the findings made by the jury, made additional findings of fact, and rendered judgment in harmony therewith for plaintiff. Defendants have appealed.

The record discloses that Herman Rehberg and his wife, Millie, lived in or near Bennington, in Ottawa county, for many years. They had no children. The wife died intestate October 28, 1932; he died intestate September 15, 1934, at the age of 72. At the time of his death he was the record owner of what is spoken of as the home place, a farm of 192 acres, situated about two miles from Bennington, of the value of $6,000, being the property involved in this action. He was also the record owner of 370 acres of other farm and pasture land in that county, his residence property in Bennington, and a substantial amount of personal property, the value of all of which is not shown. About 1912 he leased the home place to Anthony Schuler, the father of Carl Schuler, the husband of plaintiff. Carl lived there with his father. He and plaintiff were married in 1919 and went there to live. In 1930 he became the tenant and continued to live there until the death of Herman Rehberg, and since. Shortly after the death of Herman Rehberg his brother, Julius Rehberg, was appointed and qualified as administrator of his estate. Later he paid past-due taxes on the home place, insured the improvements

thereon, and caused written notice to be served upon Carl Schuler of the termination of his tenancy.

This action was brought February 7, 1935. In the amended petition, among other things, it was alleged that in November, 1932, "Herman Rehberg came to the home of this plaintiff and orally proposed to her in substance that if the plaintiff, with the help of her husband, when needed, would look after him, care for him when sick when requested and give him a home with them if he should request it, that he would leave to plaintiff and she should have at his death," the home place, "and plaintiff would thereby become the owner thereof"; that plaintiff accepted this proposition, and relying upon the contract so made plaintiff, with the help of her husband, fully performed the contract on her part. Details of what was done were alleged. It was further alleged Herman Rehberg orally represented to plaintiff that he had made, or would make such papers as were necessary to vest title to the home place in her at his death, but that he had not done so, and that defendants were claiming title to the property. The prayer was that plaintiff be adjudged to be the owner of the property in fee simple. The answer denied that the contract relied upon was made, or if made that it was performed on plaintiff's part, pleaded the statute of frauds, and alleged that such services as were performed by plaintiff could be valued and paid in money, and that in any event it would be inequitable to decree specific performance. The reply was a general denial.

At the close of the evidence the court found the contract was made as alleged by plaintiff, that it was fully performed on her part, and that it would be inequitable not to enforce it, and decreed specific performance.

Appellants contend the contract pleaded by plaintiff is too indefinite and uncertain to state a cause of action in equity; that the findings of the trial court are exaggerated and not sustained by the evidence; that there is no substantial proof of the contract pleaded; that the court erred in rejecting testimony offered by defendants and in admitting certain testimony offered by plaintiff; that the performance shown does not comply with the terms of the contract; that the value of services claimed to have been done by plaintiff can be ascertained easily and paid in money; that the value of the services shown to have been performed by plaintiff is not commensurate to the value of the property involved, and that plaintiff should gain no advantage by filing this action for specific perform-

ance within the time in which she could have filed in the probate court a claim for services performed.

This is largely a fact case. In the perhaps too many cases of this general character which have reached this court, each different from the other on the facts, the rules of law relating to them have become fairly well settled. (See *Woltz v. First Trust Co.*, 135 Kan. 253, 259-261, 9 P. 2d 665.) While it would be better for all parties if the contract such as is relied upon here were reduced to writing in all cases, the fact remains that is not always done. There are or may be bona fide cases in which oral contracts of this character are made and fully performed on one side, but not on the other. In such instances the contract may be enforced by an action in specific performance. The statute of frauds is not a bar to such enforcement. (*Smith v. Nyburg*, 136 Kan. 572, 576, 16 P. 2d 493.) Since the action is brought and tried after the lips of one of the parties to the contract have been closed by death, to guard against imposition and fraud courts must scrutinize with care the testimony offered to establish the contract and its performance. This is especially true where the testimony comes from the plaintiff, or from his or her near relatives. But even the testimony of interested parties may be true. Our statute (R. S. 60-2804) makes plaintiff an incompetent witness to transactions or communications she had personally with Herman Rehberg. Hence, the general rule laid down in the cases is that the evidence must be competent, relative and material, it must come from witnesses competent under the law to testify, and when weighed in its entirety it must be clear, convincing and satisfactory. The duty of weighing the evidence and determining its sufficiency primarily is that of the trial court. In this case, realizing the importance of determining the facts, the trial court called to its aid an advisory jury. As in other fact cases, this court examines the evidence, when its sufficiency is questioned, only to see that there is substantial, competent evidence, from witnesses competent under the law to testify, to sustain the findings and judgment of the trial court.

In this case the fact that the contract alleged in the petition was made, and its terms, was established primarily by the testimony of plaintiff's husband, Carl Schuler. He testified Herman Rehberg told him he had made the contract with plaintiff. Plaintiff was present and testified to the conversation between the two men. Our statute (R. S. 60-2804) does not make her an incompetent witness as to

such testimony. Appellants contend she participated in the conversation between her husband and Herman Rehberg, and hence was an incompetent witness under the statute. A careful examination of the testimony discloses the point is not well taken. More than that, this question was raised too late, if clearly raised at all, in the trial court. This was testimony which needed to be weighed with care. In doing so the advisory jury and the trial court necessarily would consider the interest of these witnesses in the outcome of the case, their candor and demeanor while testifying, and all other relevant facts and circumstances shown by the evidence. The other facts and circumstances bearing upon the contract and its performance, shown by the evidence, may be summarized as follows: Mrs. Rehberg had been in poor health for some time prior to her death. She was afflicted with palsy, or creeping paralysis. Beginning as much as two years prior to her death, and at the request of Mr. or Mrs. Rehberg, or both, plaintiff began assisting Mrs. Rehberg in caring for her house and in waiting on her. Plaintiff went to the Rehberg home frequently; oftener as Mrs. Rehberg's health declined. In general, she did anything to be done about the place— cleaned up the house, did the washing or ironing, sometimes the cooking, helped Mrs. Rehberg dress when she was unable to do so, and generally did the things to be done about the house. She frequently took bread, broth, eggs, butter and other edibles to Mrs. Rehberg. Finally the Rehbergs employed a nurse, but she did not stay at night. Plaintiff frequently stayed a part or all of the night with Mrs. Rehberg. She also continued to go almost daily and do some of the work. The Rehbergs changed nurses. The second one stayed there all the time. Mrs. Rehberg's condition then was such as to take almost the entire time of the nurse. During the last seven weeks of Mrs. Rehberg's illness plaintiff did much of the housework. She also assisted the nurse in caring for Mrs. Rehberg, especially caring for her during the hours of the day or night when the nurse needed rest. This nurse stayed a few days with Mr. Rehberg after Mrs. Rehberg's death. She asked Mr. Rehberg if he were paying plaintiff for what she had done. He replied that he and his wife had talked it over and had agreed to leave the home place to plaintiff when they were through with it. He spoke of plaintiff as being like a daughter, and expressed great appreciation of her help. About a week after the death of his wife Mr. Rehberg went to the home of plaintiff and talked with her shortly before noon. When plaintiff's

husband came to the house Rehberg told him of the proposition he had made to plaintiff. This was testified to by plaintiff's husband and by plaintiff, as above stated. At that time Herman Rehberg was seventy years of age. Aside from what is spoken of as heart trouble his general health was good. In addition to his farming operations he was financially interested in some of the businesses in Bennington, and he continued to look after his business affairs until his death. His heart trouble manifested itself in attacks which came on suddenly. The testimony discloses one of these attacks came when he was standing. He fell unconscious. Those near him thought he was dead. In a few minutes he began to revive, but it was two or three days before he was feeling fully himself again. While it appears from the evidence he was accustomed to having such attacks it is not brought out very clearly how frequently they occurred, or the nature of the malady which produced them, or what treatment, if any, was given him for them. There is evidence that plaintiff relied upon the contract or agreement she had with Herman Rehberg, which in effect was that she, with the aid of her husband, was to care for him and his home, even to furnish him a home if that should be needed, as long as he lived, and that at his death he was to leave her the home place. At one time he informed her he had it fixed so that she would get the home place at his death. Later, and to several witnesses, he stated in substance that the home place was to be plaintiff's when he was through with it, and to some he stated that he had fixed it so she would have it; that he and his wife had talked about it and thought that was the thing to do. There is evidence, also, that she did look after and care for him as long as he lived. He continued to make his home at his residence in Bennington. She went there as often as twice a week and cleaned up his house, did his washing and ironing, mended his clothes, and cooked things for him to eat, and on occasions when he was not feeling well she went more frequently, sometimes every day. She called him by telephone every day, and arranged with his physician and a neighbor to be called if there was any occasion for it. When he went away, as he sometimes did, to Salina, Ellsworth, or elsewhere, he left the keys for his house with her. He went to the farm frequently, much of the time daily, for his dinner, sometimes staying about the place all afternoon and taking his supper there. He liked plaintiff's cooking. He is quoted as having said when he wanted a good meal "he went to Minnie's for it." At times when

he was not feeling well she and her husband would go to his home of an evening, and on many occasions her husband stayed at night. This happened a good many times. Sometimes plaintiff stayed with her husband at night, and sometimes went to a neighbor's late in the night. In the summer of 1933 Mr. Rehberg went by bus on a trip through Minnesota and Wisconsin, and was gone about two months. Aside from that time plaintiff, with the aid of her husband when needed, looked after and took care of Herman Rehberg continuously and daily from the time of the making of the contract, early in November, 1932, until his death. He died at plaintiff's home, having gone there the day before and staying all night. In the summer of 1934 Mr. Rehberg had the old barn on the home place torn down and a new metal-covered barn built. Plaintiff's husband cut the timbers for the framework of this barn, helped to build it, and paid for the labor of another person who helped build it. Mr. Rehberg paid for the material, and possibly paid for some of the labor. He also had a new well dug. Someone asked him why he was having those improvements made, and he said he was doing it for the kids, it was to be theirs, or words to that effect. One workman asked him about the plan of the barn. He said to build it like Carl wanted it, for he was the one that would use it. We think this evidence sufficient to sustain the finding of the trial court that the contract pleaded was made and that it was relied upon and fully performed by plaintiff.

Appellants argue that the contract pleaded was too indefinite and uncertain to state a cause of action in equity. The words "care for," "when needed," and "when requested," used in the contract are quite indefinite, but when we consider the prior relation of the parties it is quite clear they understood the terms of the contract and the obligations imposed by the language used. Their subsequent conduct and relations confirm this view. So considered, the contract cannot be said to be too indefinite and uncertain to be enforced by a court of equity after it has been fully preformed by one of the parties. Appellants argue the findings of the trial court are exaggerated and not sustained by the evidence. We have carefully examined the findings and the evidence, and considered all counsel say about it, and find no substantial ground for this contention. In a few instances, where the witnesses differed in their testimony as to the extent of certain services, the court obviously believed and used the testimony of the witnesses most favorable to

plaintiff, and in one instance used language which may be construed as finding that several witnesses testified to a specific fact when but one had done so. At the most these matters are of but little consequence. We find substantial, competent evidence to sustain each and all of the findings made by the court. We also find appellants' criticism of the court's ruling on the admission of evidence to be without substantial merit. We find it unnecessary to state and discuss these rulings in detail.

Appellants argue the value of the services shown to be performed by plaintiff readily could be ascertained and paid in money; that they were inconsequential compared to the value of the property; hence, it was error to decree specific performance of the contract, citing on this point *Anderson v. Anderson,* 75 Kan. 117, 88 Pac. 743; *Woltz v. First Trust Co.,* 135 Kan. 253, 261, 9 P. 2d 665; *Laupheimer v. Buck,* 135 Kan. 631, 637, 11 P. 2d 721. These authorities are to the effect that courts of equity will decline to decree specific performance where the services performed, or to be performed under the contract, are inconsequential compared with the compensation to be paid. In applying that principle, however, courts are reluctant to make new contracts for parties. In this case the court cannot say that the contract, when made, was so inequitable in this regard that it should not be enforced. At the time the contract was made Herman Rehberg was seventy years of age. Generally speaking, his health was good, aside from his attacks of heart trouble, the seriousness of which possibly none of the parties realized, and which perhaps he discounted. He might have lived ten or even twenty years, and his health might have been such that the care required would have made the compensation agreed to be paid and accepted look meager. In that event perhaps appellants would have been glad there was a limitation placed in the contract upon the amount plaintiff was to receive. It is only because his death occurred a little less than two years after the contract was made that the compensation seems large. No doubt the fact that he had made a suitable provision for his care for the remainder of his life, whatever time that might be, for a definite portion of his property, was a thing he regarded as of value. The trial court did not regard the value of the property to be left plaintiff so out of proportion to the services to be performed under the contract, and which were performed, as to justify refusing specific performance. This, also, was the view of the advisory jury. The disproportion is not so great

that we should say, as a matter of law, the contract made should be disregarded, and that plaintiff should have presented her claim against the estate for services performed. She is not a person who had been accustomed to work for wages in the homes of others.

The judgment of the trial court is affirmed.