No. 42,291

In the Matter of the Estate of Frank Mueseler, Deceased. KARL H. MUESELER, *Appellant*, v. JOHNNIE WENGER, Executor, LUTHERAN CHILDREN'S FRIEND SOCIETY, THE LUTHERAN HOUR, and THE CHURCH EXTENSION FUND, KANSAS DISTRICT LUTHERAN CHURCH, MISSOURI SYNOD, *Appellees*.

(362 P. 2d 653)

Opinion filed June 10, 1961.

*Richard W. Shaw* of Hiawatha argued the cause, and *Lewis E. Helvern* of Hiawatha was with him on the briefs for the appellant.

*Clarence J. Moore* of Horton argued the cause, and *Roy V. Nelson* of Hiawatha was with him on the briefs for the appellees.

The opinion of the court was delivered by

JACKSON, J.: Frank Mueseler, now deceased, was in his life time a farmer in Brown county. Upon his death in December, 1957, his will was probated in the probate court of Brown county having been admitted to probate on January 24, 1958, and on the same date the executor named in the will was appointed. The three Lutheran church societies were the only named beneficiaries under the will.

Karl H. Mueseler is the only child and sole heir of the above named testator. Karl made no objection to the will until the executor had sold the real estate then owned by the testator, paid the debts and otherwise administered the estate. The executor then filed his petition for final settlement in which he named the above church societies as legatees and devisees. At this time Karl filed his "objections, exceptions and defenses" to the executor's petition.

The chief "objection" contained in the above pleading and the

only one concerned in the present appeal was stated in part as follows:

"4. That on or about the 2nd day of February, 1955, and for some time prior and subsequent thereto, very friendly and confidential, social and business relations existed between Karl H. Mueseler and his father, Frank Mueseler, induced and sustained by mutual business dealings and transactions particularly as to farming in which they were at times mutually and jointly interested. That at about the time aforementioned, the said Frank Mueseler expressed and stated to Karl H. Mueseler that he wished to retire from active farming, and yet have ready cash to care for himself without disposing of all his holdings, which then consisted of 200 acres of land in Brown County, Kansas, and some personal property.

"That to effect this desire of Frank Mueseler, Karl H. Mueseler met with Frank Mueseler and his attorney Roy V. Nelson, at said attorney's office in Hiawatha, Kansas, on or about the date first above mentioned. There the matter was discussed and an agreement was reached between Karl H. Mueseler and his father, Frank Mueseler, whereby Frank Mueseler would convey to Karl H. Mueseler, an 80 acres of land, described as: (Land described) assessed at the value of $5425.00, for which Karl H. Mueseler would pay to Frank Mueseler such money as Frank Mueseler would require and need. That at this time Frank Mueseler suggested a maximum payment from his son Karl H. Mueseler, of $18,000.00, and Karl H. Mueseler suggested a maximum payment for said land of $15,000.00, but no agreement was had on the maximum to be paid Frank Mueseler by Karl H. Mueseler for said land. That at this time Karl H. Mueseler stated to his father, Frank Mueseler and his attorney, Roy V. Nelson, that he was unable to finance such a purchase and undertaking without mortgaging his own property, and thereupon Frank Mueseler stated that whatever Karl H. Mueseler paid, even up to the maximum of $18,000.00, as suggested by the father, would not matter because Karl H. Mueseler would receive all of his father's property upon the death of his parents as their only child. Roy V. Nelson, attorney for the father, made similar statements in behalf of Frank Mueseler to Karl H. Mueseler at or about said time, telling Karl H. Mueseler of a last will and testament of Frank Mueseler devising and bequeathing all property to Karl H. Mueseler after the life estate of testator's wife, Anna Mueseler. That the spouse of Frank Mueseler was at this time incompetent, and did not enter into any part of the transaction. At this time it was knowledgeable to all parties present that Frank Mueseler had executed a last will and testament, accomplishing by its terms, bequests and devises to his only child, Karl H. Mueseler, subject to the aforementioned life estate of testator's spouse, mother of Karl H. Mueseler. On such inducement, Karl H. Mueseler agreed to the acceptance of said deed, and the payments to be made by him to Frank Mueseler, but with no agreement or understanding as to the maximum to be paid, and pursuant thereto, Karl H. Mueseler mortgaged other property of his own and began payment to Frank Mueseler for the deed which Frank Mueseler executed to said property and delivered to Karl H. Mueseler, . . ."

The pleading continued by alleging the recording of the deed to the eighty acres, just referred to, and further alleging that Karl made payments to his father from time to time beginning in April, 1955 and ending in March, 1957. The payments totaled $11,-703.94. It was also alleged that the wife and mother died on February 2, 1957, and that the land conveyed to Karl by his father was then free of any inchoate claim of the mother based upon the fact that she had not signed the deed to Karl. It was further alleged that because of the confidential relations existing between Karl and his father, he relied upon his father to keep his promises and leave the father's estate to him; that without the knowledge of Karl, the father made the present probated will leaving his estate to others; that Karl not knowing of the new will of his father continued to make payments to him under the above alleged agreement. Karl then alleged in effect that the beneficiaries under the probated will should take nothing and that he should, as beneficiary under the alleged contract and as sole heir of his father, be declared to be the sole owner of the estate.

Karl later filed his petition to transfer the hearing of the above matters to the district court. The district court took jurisdiction of the hearing and after a full hearing denied the claims of Karl and ordered that the estate should be distributed as provided in the will and the report of the executor. Karl has appealed to this court from the decree of the district court.

In discussing the questions presented to this court, we shall for the sake of brevity continue to refer to the appellant by this first name. We shall also observe in the beginning that, as we read the record, the learned trial judge decided the question of Karl's rights to the estate principally upon one question. The district court decided that Karl had not proved that there was in fact any oral contract to leave the father's estate to Karl.

We would first point out that under the decisions of this court the trial court was under a duty to find that the contract had been pleaded and proved by clear and satisfactory proof and also that the party asserting the contract had complied with the contract and should in equity and good conscience be entitled to possess the fruits of such contract.

In the case of *Jones v. Davis,* 165 Kan. 626, 631, 197 P. 2d 932, plaintiff attempted to set up an oral contract under which plaintiff claimed an interest in real estate of a decedent. At page 631 of the

opinion, the court set out the rule applicable to the trial court in passing upon such contracts as follows:

"On many occasions this court has had before it contracts of the general nature of the one now under consideration, and in connection therewith has discussed the nature and validity of such contracts, the sufficiency of pleading and proof of the asserted contract, and whether in equity it should be enforced. In the briefs many of these decisions are cited in support of contentions advanced but limits of space prevent detailed reference to them. Both parties direct our attention to *Woltz v. First Trust Co.*, 135 Kan. 253, 9 P. 2d 665, where the plaintiff was denied relief. In the opinion, prepared by Mr. Justice Harvey, may be found an exhaustive review of our previous decisions, and listing those where relief was allowed and where it was denied. Although reference is made to that opinion for a more complete statement, *in effect the court held that it must be pleaded and shown by clear and satisfactory proof that there was a contract, and compliance therewith by the party asserting the same under which, in equity and good conscience, he should possess and enjoy the property as against those who would otherwise be entitled to it.* The principles laid down in the above case have been followed in many subsequent decisions, among which are the following: *Smith v. Nyburg,* 136 Kan. 572, 16 P. 2d 493; *Logston v. Needham,* 138 Kan. 439, 26 P. 2d 443; *Johnson v. Lander,* 140 Kan. 329, 36 P. 2d 1006; *Trackwell v. Walker,* 142 Kan. 367, 46 P. 2d 603; *Schuler v. Rehberg,* 145 Kan. 176, 64 P. 2d 571; *Dent v. Morton,* 148 Kan. 97, 79 P. 2d 875; *Popp v. Wilhelm,* 150 Kan. 753, 96 P. 2d 620; *West v. Sims,* 153 Kan. 248, 109 P. 2d 479; *Bond v. Bond,* 154 Kan. 358, 118 P. 2d 549; *Staab v. Staab,* 160 Kan. 417, 163 P. 2d 418; as well as many others cited therein." (Emphasis supplied.)

Of course, the facts of the case of *Jones v. Davis,* supra, differed from the particular facts in this case, but we believe the rule as to the amount of proof of the oral contract applied with equal force to this case. The Jones case has been cited with approval in the following recent cases: *In re Estate of Spark,* 168 Kan. 270, 212 P. 2d 369; *In re Estate of Boller,* 173 Kan. 30, 244 P. 2d 678; *Texas Co. v. Sloan,* 175 Kan. 735, 267 P. 2d 919; and *Pattimore v. Davis,* 180 Kan. 534, 305 P. 2d 835.

We now turn to the abstract to study the proof offered by Karl as to the existence of the alleged oral contract. Karl's wife testified that the father wanted to quit farming and move to town and needed money to buy a place in town; that the father approached his son about the latter buying an eighty acre tract. The father wanted $18,000 maximum and his attorney talked of $15,000 as did Karl.

"Well, he wanted the money to buy a place in town and he approached us about the place and we wasn't interested. We had all we could handle as it was."

The wife's testimony as shown in the abstract continues:

"Q. Did there come a time when they did come to an understanding about the purchase of this land?

"A. They didn't come to very much of an understanding. We were going to but it but there was no understanding. He said he had to have Two Thousand dollars to pay down on that house.

"Q. Did you hear any conversation at that time about what was to be paid and how it was to be paid?

"A. No, he said that morning, once he said, 'You just pay me as I need it' and he wouldn't say, he said, 'you needn't come to any price. You are going to get it all some day.'"

After the first of the year, the father talked to his son, Karl, again about buying the land.

"Q. And did he say anything to Karl at that time?

"A. Well, I don't think any more was said except that—except he said there was no use to say anything about price. That he was going to get it all someday.

"Q. Do you know whether there was anything paid to Frank Mueseler about this time?

"A. Yes, he gave him a check the 11th of January for a down payment on the house.

. . . . . . . . . . . . . .

"Q. Did there ever come a time when they were no longer on friendly terms, Karl and his father?

"A. Well, I guess so.

"Q. You guess so, do you know so?

"A. I know so.

"Q. About when was that?

"A. Probably about the first of the year in '56."

A neighboring farmer testified that the father approached him about buying the eighty—that the witness asked if Karl did not want the place, and that later the father returned and said Karl was going to buy it. "It is better that way, Karl is going to get it all anyhow."

Karl then testified in his own behalf. He identified the deed for the eighty acres and the checks given to his father for payment. He related that he went to the office of his father's attorney where the deed was made out. There was no writing besides the deed. The record of Karl's testimony continues:

"Q. Did there come a time when Mr. Nelson talked to you or wrote you about interest payments?

"A. He wrote about the interest but not the payments cause there never was an—

"Q. You mean the payments, I mean interest? .

"A. Yes, it was about the interest but not about payments cause there never was no agreement about the payments.

"Q. Do you know of any interest payments that you did make, what they were based on?

"A. I didn't pay interest cause I thought he didn't expect interest, then here come a letter from Mr. Nelson. My father said for him to collect interest from me. 'Karl hadn't paid the interest' he said.

"Q. Following this payment in January, and following the deed being given you in February, 1955, where did your father go? Did he stay on the farm or what?

"A. After the first payment?

"Q. Yes.

"A. Well, he went to Powhattan.

"Q. Was there anything ever said to you about any will and testament of your father's?

"A. Yes, he gave the impression to me that I was getting it all under the conditions we agreed with.

"Q. What did Mr. Nelson say to you?

"A. Well, when he was making up this agreement?

"Q. No, about any will or testament or disposition of Frank Mueseler.

"A. He would disinherit me if I antagonized him.

"Q. Did he say anything else?

"A. He said I was going to get it all anyway, and not to antagonize him.

"Q. Now did you ever see any other will of your father?

"A. Yes.

"Q. When was that?

"A. At the hearing of the will. We were down at the office at the hearing of the will and Mr. Nelson had two sheets of paper out there and he said 'Your dad had two wills before this one. In one you were going to get it all.' In the first one, I was disinherited and the next one I got it all and the last one I was disinherited again.

"Q. The last one you made reference to, is that the one that was filed?

"A. Yes."

A nephew of the father, who was also a neighboring farmer, testified about two conversations with the father. In the first, he had complimented his uncle on the fact that he understood he was intending to leave his estate to his son Karl. In the second conversation, the witness told of criticizing his uncle because the witness had heard that his Uncle Frank had changed his will and was leaving his estate to strangers. The witness testified:

"I said to him, 'Why did you do a thing like that, Uncle Frank?' and he said 'Because he don't pay me any more. I sold him that place and everything and he just don't pay me any more,' that is all I can recollect about that."

It may be observed that Karl testified he did not know his father had disinherited him until the father's will was probated. But he

testified as shown above that his father's attorney warned him that if he antagonized his father, the father would do so. This might well indicate that the attorney did not understand that there was any contract binding upon the father to leave his estate to the son.

We think that upon the above evidence the trial court can not be said to have erred in holding that the alleged oral contract was not clearly proved. In fact, a careful examination will show that nowhere was there shown any definite promise on the part of the father. True, at the time the deed for the eighty acres was given to the son, the son was the ultimate legatee and devisee of his father's estate, but there is shown to have been no promise on the part of the father not to change the will. The father's attorney warned the son about antagonizing the father, and yet the son quibbled over paying the father money for his living expenses. Perhaps, the son was too much like his father in wanting to get a good bargain. While we are inclined to sympathize with the son under all of the facts, we can not say that the trial court erred in holding the father was not shown to have contracted away his right to change his will.

Other matters are discussed in the briefs, but none which would help the appellant. The judgment appealed from must be affirmed and it is so ordered.