(628 P.2d 1080)

No. 51,804

Marvin Stratmann, *Appellee,* v. Bert J. Stratmann and Mathilda Stratmann, *Appellants,* v. National Cooperative Refinery Association, Inc., *Appellee.*

Opinion filed June 5, 1981.

*Edward R. Moses,* of Great Bend, for appellants.

*John Sherman,* of Aylward, Svaty & Sherman, of Ellsworth, for appellee Marvin Stratmann.

Before ABBOTT, P.J., SWINEHART and MEYER, JJ.

MEYER, J.: This appeal involves a quiet title action of an oil and gas royalty interest.

In 1940, Tena Stratmann and her children, appellants Bert and Mathilda (Bert and Mathilda), Edwin, Otto, Ervin, and appellee Marvin (Marvin), executed an oil and gas lease retaining a ⅛ landowners' royalty plus a 1/16 overriding royalty on the property herein involved. Through a series of successions, by 1960 each child possessed a ⅕ interest in the landowners' royalty and the overriding royalty. In 1961, Otto petitioned for partition of all the Stratmann land. In the partition action, the tract upon which the oil and gas lease was held was purchased by Bert, Otto, Marvin and Mathilda from the fifth brother, Ervin, and each had a ¼ interest in the land. The mineral interest was not partitioned and the interest in the land was subject to the ⅕ interest in the royalty.

Bert, Otto and Mathilda paid into the court the full purchase

price for Ervin's land, including Marvin's share, but Marvin failed to reimburse them. The dispute was settled by a voluntary division of the land whereby Marvin quitclaimed his interest in the tract in question to Bert, Otto and Mathilda, without reserving his royalty interest. The deed was filed January 8, 1962. Otto told Marvin that the quitclaim deed would not affect his right to receive royalties from the land. Otto and Bert had discussed the matter and Bert stated at the time, "I wanted to take the oil right away but Otto always said, 'Let the poor sucker have some. He can't even make his living.' " Bert knew he was only receiving his own royalty share and allowed Marvin to continue to receive his.

In 1973, Otto died leaving his entire estate to Bert and Mathilda to share and share alike. The interest of the quitclaim deed was listed as an asset of Otto's estate. Such assets included a $\frac{1}{5}$ of $\frac{1}{8}$ royalty interest plus a $\frac{1}{16}$ of $\frac{1}{8}$ overriding royalty. But this interest Otto had already owned before Marvin's quitclaim deed was given. Had it been meant to include Otto's share of any royalty received from Marvin, the inventory would have shown an additional royalty.

In 1977, Bert forwarded a copy of the quitclaim deed to National Cooperative Refinery Association, Inc. (NCRA), the corporation which produced oil from which the royalty was paid. NCRA prepared its transfer order transferring Marvin's interest to Bert and Mathilda equally. Marvin refused to sign the transfer, arguing that Otto had told him the deed transferred only the real estate and not the mineral interest therein. NCRA suspended paying the royalty July 1, 1977, until the court could determine the ownership of the royalty interest.

Marvin filed this action June 30, 1978, claiming ownership to $\frac{1}{5}$ of $\frac{1}{8}$ royalty through adverse possession for more than 15 years. Marvin received the royalty payments and paid the taxes on that income since the lease was executed in 1940. The case was submitted to the court for summary judgment on documentary evidence. The court concluded: (1) the $\frac{1}{5}$ of $\frac{1}{8}$ royalty interest in dispute was personal property; (2) adverse possession did not apply to the royalty interest; and (3) appellee Marvin's title to the disputed royalty interest was quieted in him against appellants Bert and Mathilda on a waiver and estoppel theory. Bert and Mathilda appeal.

We first address the question as to what interest, royalty or mineral, Marvin possessed prior to the quitclaim deed of 1961.

The trial court found that Marvin had an interest in the real property involved herein, and on said property he had a royalty interest on oil and gas produced, said interest being ⅕ of ⅛ royalty interest. The court also found that the mineral fee had never been separated from the surface fee through deed or other proceedings.

Kansas has defined royalty interests and mineral interests as follows:

"As we have frequently stated the term 'royalty' is often rather loosely and inaccurately used by men in the petroleum industry, those dealing in oil and gas holdings and at times by attorneys. Some persons refer to oil and gas in place as royalty. Others refer to royalty as the landowner's share in production. We have, therefore, repeatedly held the true nature and character of the instrument is not to be determined by the name or label attached thereto but by its intent as reflected by the terms, the contents thereof. A few of such cases are *Serena v. Rubin,* 146 Kan. 603, 72 P.2d 995; *Fry v. Dewees,* 151 Kan. 488, 99 P.2d 844; *Rutland Savings Bank v. Steele,* 155 Kan. 667, 127 P.2d 471; *Dennett v. Meredith,* 168 Kan. 58, 64, 211 P.2d 117. See, also, annotation in 4 A.L.R.2d 492, 496.

"A mineral deed is one which makes a severance, from the fee, of a present title to minerals in place. It is actually a realty conveyance. (*Richards v. Shearer,* 145 Kan. 88, 64 P.2d 56; *Rathbun v. Williams,* 154 Kan. 601, 121 P.2d 243; *Hickey v. Dirks,* 156 Kan. 326, 327, 133 P.2d 107.) On the other hand 'royalty' in its ordinary meaning is that part of oil and gas payable to the lessor by the lessee out of oil and gas actually produced and saved. It is the compensation to the lessor provided in the lease for the lessee's privilege of drilling and producing oil or gas. It does not include a perpetual interest in and to the oil and gas in place. (*Bellport v. Harrison,* 123 Kan. 310, 255 Pac. 52; *Burden v. Gypsy Oil Co.,* 141 Kan. 147, 40 P.2d 463; *Rutland Savings Bank v. Steele,* supra; *Rathbun v. Williams,* supra.) It is not uncommon to find 'royalty' shortly defined as 'a share' in production 'paid.' (Anno. 4 A.L.R.2d 492, 497.) It is personal property. (*Hickey v. Dirks,* supra, and cases therein cited.) The lessee's interest in the oil produced, commonly seven-eighths or whatever the lease provides, is called the working interest. (*Robinson v. Jones,* 119 Kan. 609, 240 Pac. 957; *Davis v. Hurst,* 150 Kan. 130, 90 P.2d 1100.)" *Lathrop v. Eyestone,* 170 Kan. 419, 423-24, 227 P.2d 136 (1951).

Bert and Mathilda assert that Marvin possessed a mineral interest in the oil and gas in place which was separate from the surface fee, due to the partition action.

First, it should be noted that Bert and Mathilda misstate what the trial court held. They state that the district court found that they had permanently lost their rights to the *oil and gas in place* and royalty attributable thereto by virtue of Marvin's receipt of

the royalty payments in excess of 15 years. The trial court merely quieted Marvin's title to the royalty payments only.

The partition action in this case was the subject of an earlier appeal to the Supreme Court. In *Stratmann v. Stratmann,* 204 Kan. 658, 465 P.2d 938 (1970), the court held that the 1961 partition action gave each heir a ⅕ interest in the oil, gas and minerals underlying the entire 240 acres of land (including the present tract of land in question), said interest to be determinable at such time as production of oil and gas or either of them in paying quantities ceased from the 240 acres described.

The mineral interest was therefore severed by the partition action, and prior to the quitclaim deed, Marvin had an undivided ⅕ interest in the minerals in place, terminable upon cessation of oil and gas production and a ¼ interest in the surface real estate. As part of said interest in the oil and gas, Marvin had a right to royalty payments from the oil and gas lease thereon. The trial court was, therefore, incorrect in stating that the mineral fee had never been severed from the surface fee. However, that does not affect the outcome of the case, as will be explained.

Bert's and Mathilda's contention that the quitclaim deed passed Marvin's interest in the real estate surface and mineral interest in the oil and gas in place was correct. Even though the mineral interest was severed from the surface fee, the interest passed to the grantee of the quitclaim deed. See *Fast v. Fast,* 209 Kan. 24, 496 P.2d 171 (1972).

The court held in *Fast* that a deed which mentioned only a surface interest but did not make a specific reservation of the mineral interest passed both the surface and the mineral interest even though the mineral interest had previously been severed from the surface interest. In so holding, the court interpreted K.S.A. 58-2202. This statute provides, in part:

"[E]very conveyance of real estate shall pass all the estate of the grantor therein, unless the intent to pass a less estate shall expressly appear or be necessarily implied in the terms of the grant."

This decision is in accordance with the general rule as stated in 1A Summers, Oil and Gas § 133, pages 218-228 (1954 rev.):

"A landowner may create a separate legal interest or estate in the oil and gas under his land, apart from the interest in the land itself, by a direct grant of the oil and gas, or by a grant of the land with an express reservation or exception of the oil and gas. . . . [W]here the landowner grants the land, without expressing an intention to retain his legal interest in the oil and gas thereunder, that legal interest will pass with the land as accessory to it."

We note that *Stratmann v. Stratmann,* 204 Kan. at 663, states:

"A mineral interest normally includes a royalty interest in the sense that a mineral owner who has joined in a lease becomes a royalty owner. [Citation omitted.] By virtue of the ownership of the minerals in place and the rights created by the lease the mineral owner holds an interest in the lease royalties. The royalties in such case are dependent upon the terms of the lease which is carved out of the mineral interest. Such a royalty interest may be made dependent upon continued production from the lease and in such case will expire or terminate if production under the lease ceases."

We hold that the royalty interest would pass along with the mineral and surface interest, unless there was an express reservation in the deed.

Bert and Mathilda are also correct in their claim that a royalty interest could not be the subject of adverse possession since it was personal property. A royalty interest is personal property. *Lathrop v. Eyestone,* 170 Kan. at 424.

K.S.A. 60-503 provides:

"No action shall be maintained against any person for the recovery of *real property* who has been in open, exclusive and continuous possession of such real property, either under a claim knowingly adverse or under a belief of ownership, for a period of fifteen (15) years." (Emphasis added.)

Adverse possession applies only to real property. One cannot obtain a royalty interest by adverse possession.

Furthermore, any argument that the collection of royalty payments for 20 years constituted adverse possession of the minerals in place (realty) lacks merit.

Collection of royalty payments has been held not to constitute adverse possession of the minerals in place. Such collection of royalty payments is merely conversion of the oil and gas that has already been produced and does not affect what remains in the ground. *Saunders v. Hornsby,* 173 S.W.2d 795 (Tex. Civ. App. 1943). See also *Warmack v. Henry H. Cross Company,* 237 Ark. 869, 377 S.W.2d 47 (1964).

We affirm the trial court's ruling that the theory of adverse possession is not applicable herein.

Having dealt with the preliminary issues, we reach the main issue of whether Bert's and Mathilda's rights to the royalty interest were lost by estoppel, waiver or laches.

The trial court quieted title to Marvin's royalty interest because the evidence showed that Bert and Mathilda knew that they had a right to the royalty payments by virtue of the quitclaim deed,

knew that Marvin was receiving said proceeds, and allowed him to receive the royalty payments for 15 years before taking the deed to NCRA and claiming they had a right to the royalty payments.

The trial court based its decision on the theories of estoppel, waiver and laches.

## Estoppel

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. [Citation omitted.]" *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.,* 221 Kan. 523, 527, 561 P.2d 792 (1977).

Further:

"One who asserts an estoppel must show some change in position in reliance on the adversary's misleading statement. [Citations omitted.]" *In re Morgan,* 219 Kan. 136, 137, 546 P.2d 1394 (1976).

The misrepresentation in this case was Otto's telling Marvin that the quitclaim deed would not affect his right to collect royalties when in fact it did. The misrepresentation was made in order to induce Marvin to give up the land.

Bert and Mathilda argue there was certainly no detriment, but rather a benefit to Marvin because he was able to receive the royalty payments in the past.

In *Fast v. Fast,* 209 Kan. 24, it was claimed that the defendants were estopped to claim title to the minerals because the grantor had continued to receive royalties and pay taxes on the interest until he died. The court held there was no misrepresentation or detrimental reliance.

Here there was a misrepresentation and Marvin claims there was detrimental reliance because had the claim to the royalty interest been raised earlier, he could have brought suit for fraud and cancelled the transfer. Now the evidence is stale and the person who made the alleged representation dead. We conclude that the disadvantage to Marvin if a fraud suit were brought now is sufficient to constitute detrimental reliance.

It should also be noted that the mere signing of a division order which gives a right to the royalties has been held not to be enough

to constitute estoppel. As stated in *Wagner v. Sunray Mid-Continent Oil Co.*, 182 Kan. 81, 318 P.2d 1039 (1957), the signing of a division order might estop the signer, vis-a-vis the oil company, but would not estop them as against rival claimants to a mineral interest. The court stated:

"[R]ather than reliance by the defendants to their detriment, plaintiffs' signing of the division orders in fact gave them a benefit to which they were not entitled." 182 Kan. at 93.

Bert and Mathilda are estopped by Otto's misrepresentation because they ratified the misrepresentation.

"Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority. The doctrine of ratification is based upon the assumption there has been no prior authority, and ratification by the principal of the agent's unauthorized act is equivalent to an original grant of authority. Upon acquiring knowledge of his agent's unauthorized act, the principal should promptly repudiate the act; otherwise it will be presumed he has ratified and affirmed the act. (*Theis v. duPont, Glore Forgan Inc.*, [212 Kan. 301, 304, 510 P.2d 1212 (1973)], and cases cited therein.) Knowledge of the unauthorized act is essential for the principal to ratify the act, and must be shown or facts proved that its existence is a necessary inference therefrom." *Brown v. Wichita State University*, 217 Kan. 279, 287-88, 540 P.2d 66 (1975).

We conclude that Otto, in obtaining the quitclaim deed on behalf of Bert, Mathilda and himself, was ratified in his representation that they would not take Marvin's royalty interest. Such ratification occurred because of Bert's and Mathilda's apparent agreement with Otto when he came back and said to them, "Let's let the poor sucker have some."

## Waiver

"Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. [Citation omitted.] Once it has been established that a right has been waived, the party possessing the contractual right is precluded from asserting it in a court of law." *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. at 526.

Also, it was stated in *Prather v. Colorado Oil & Gas Corp.*, 218 Kan. 111, 117, 542 P.2d 297 (1975), that "[t]he intent to waive known rights is essential."

Waiver is consensual in nature, and the intention may be inferred from conduct, and the knowledge may be actual or

constructive. *Flott v. Wenger Mixer Manufacturing Co.,* 189 Kan. 80, 90, 367 P.2d 44 (1961).

In the instant case, Bert and Mathilda, while knowing they had a right to claim the royalty interest, waived that right by failing to assert it for 15 years.·

Laches

"The doctrine of laches is an equitable device designed to bar stale claims, and courts of equity will regard long passage of time in asserting claims with disfavor apart from any particular statute of limitations." *Clark v. Chipman,* 212 Kan. 259, Syl. ¶ 6, 510 P.2d 1257 (1973).

In *Darby v. Keeran,* 211 Kan. 133, Syl. ¶ 10, 505 P.2d 710 (1973), we note:

"Delay, by itself, does not constitute laches and an action generally will not be defeated by laches alone unless some prejudice has resulted therefrom to the rights or interests of the adverse party."

Laches is usually applied as a defense to the bringing of an action. Here, it was the person asserting laches (Marvin) who brought the action to quiet title after Bert and Mathilda clouded his title by sending the quitclaim deed to NCRA. However, we conclude laches is applicable to prevent Bert and Mathilda from claiming title to the royalty payments by virtue of the quitclaim deed.

Again, the person asserting laches must show prejudice but, as was said of estoppel, if Marvin had known earlier about the loss of his royalty rights, he could have alleged fraud.

All three theories (estoppel, waiver and laches), involve questions of fact. The case was submitted to the trial court on the depositions, probate files of the former owners of the land, file of the partition action, and certain affidavits and admissions of parties.

"When a case is submitted to the trial court on an agreed stipulation of facts and documentary evidence, this court is afforded the same opportunity to consider the evidence as the trial court. [Citation omitted.]" *Stith v. Williams,* 227 Kan. 32, Syl. ¶ 1, 605 P.2d 86 (1980).

We conclude the trial court was correct in its determination that the facts herein warrant the application of estoppel, waiver and laches to prevent Bert's and Mathilda's claims to the royalty payments.

Affirmed.