No. 63,661

IN THE MATTER OF THE ESTATE OF BERT STRATMANN, a/k/a/ BERT J. STRATMANN, DECEASED.
CENTRAL KANSAS MEDICAL CENTER, FIRST PRESBYTERIAN CHURCH OF ELLSWORTH, STERLING COLLEGE, ELLSWORTH COUNTY VETERANS MEMORIAL HOSPITAL, and LUTHERAN SOCIETY GOOD SAMARITAN HOME, *Appellees,* v. EDITH STRATMANN, *Appellant.*

(806 P.2d 459)

Opinion filed February 20, 1991.

*Gerald L. Green,* of Gilliland & Hayes, P.A., of Hutchinson, argued the cause and was on the briefs for appellant.

*John Sherman,* of Svaty, Sherman & Hoffman, of Ellsworth, argued the cause for appellees, and was on the briefs for appellees First Presbyterian Church of Ellsworth, Sterling College, Ellsworth County Veterans Memorial Hospital, and Lutheran Society Good Samaritan Home.

*Robert P. Keenan,* and *Martin J. Keenan,* of Keenan Law Firm, P.A., of Great Bend, were on the briefs for appellee Central Kansas Medical Center.

*Frederick Woleslagel,* of Lyons, was on the brief for all listed charities.

The opinion of the court was delivered by

HERD, J.: This is a civil action against the estate of Bert Stratmann by several charities—Central Kansas Medical Center, First Presbyterian Church of Ellsworth, Sterling College, Ellsworth County Veterans Memorial Hospital, and Lutheran Society Good Samaritan Home. The claimants allege Bert Stratmann and his brother and sister made mutual and contractual wills, leaving all their property to the claimants. The claimants contend Bert breached the contract when he executed a new will giving all his property to Edith Stratmann, his wife. Following a jury trial, a verdict was returned in favor of the claimants.

The facts of this case reveal a long history of litigation within the Stratmann family. Tena Stratmann was the mother of seven children: Chris, Bert, Edwin, Otto, Marvin, Ervin, and Mathilda. Edwin predeceased his mother and the other children. Chris, Marvin, and Ervin each married and were thereafter treated as outsiders by the three single Stratmanns, Bert, Otto, and Mathilda. After Tena Stratmann's death in 1960, numerous lawsuits and partition actions were filed among the children. Eventually, Bert, Otto, and Mathilda each held a one-third interest of Tena Stratmann's considerable estate.

On April 23, 1970, Bert revoked all prior wills and executed a new will wherein he left all his property to Otto and Mathilda to share absolutely and forever, or to the survivor of them. In the event that Otto and Mathilda predeceased Bert, the will provided for disposition of the estate in the following manner:

St. Peter's Lutheran Cemetery Assoc., Holyrood $1,000
Good Samaritan Center Bldg. Fund, Ellsworth 10%
Ellsworth County Veterans Memorial Hosp. 10%
First Presbyterian Church of Ellsworth Bldg. Fund 30%
Sterling College Endowment for Scholarship Fund 50%

On July 16, 1970, Otto executed a similar will. He left his entire estate to Bert and Mathilda to share absolutely and forever, or to the survivor of them. In the event that Bert and Mathilda predeceased Otto, the will provided for division as follows:

St. Peter's Lutheran Cemetery Assoc., Holyrood $2,000
Good Samaritan Center Bldg. Fund, Ellsworth 10%
Ellsworth County Veterans Memorial Hosp. 10%
First Presbyterian Church of Ellsworth Bldg. Fund 25%
Central Kansas Medical Center, Great Bend 10%
Sterling College Memorial Endowment Scholarship
 Fund, as follows: 45%

Memorial Scholarship Fund
In Memory of
Bert J. Stratmann
Otto Stratmann
Mathilda Stratmann
of Lorraine, Kansas

There is no record of a 1970 will executed by Mathilda. Testimony by Mathilda in the probate of Otto's will, however, indicates she executed a reciprocal will on the same day as Otto. The drafting attorney also testified that Mathilda executed a will on July 16, 1970, and left her estate to Bert and Otto or, if neither survived, to the same charities in the same percentages as Otto's will.

Otto Stratmann died August 9, 1973, and the 1970 will was probated. Bert and Mathilda received the bulk of Otto's estate estimated at a value of $549,730.

Mathilda executed a will in 1974 and again in 1976. The June 24, 1976, will left all her property to Bert, and if he did not survive Mathilda the following disposition was ordered:

| | |
|---|---|
| St. Peter's Lutheran Cemetery Assoc., Holyrood | $ 1,500 |
| Ellsworth Memorial Cemetery | $ 1,000 |
| First Presbyterian Church of Ellsworth Bldg. Fund | $20,000 |
| Mathilda's grave maintenance | $ 1,000 |
| Bert's grave maintenance | $ 1,000 |
| Central Kansas Medical Center Bldg. Fund, Great Bend | undivided 1/2 interest in remainder |
| Sterling College Memorial Endowment Scholarship Fund, as follows: | undivided 1/2 interest in remainder |

Memorial Scholarship Fund
In Memory of
Bert J. Stratmann
Mathilda Stratmann
Otto Stratmann

Bert also executed a new will on June 24, 1976. Bert left his entire estate to Mathilda and directed the following disposition if Mathilda failed to survive him:

| | |
|---|---|
| St. Peter's Lutheran Cemetery Assoc., Holyrood | $ 1,500 |
| Ellsworth Memorial Cemetery | $ 1,000 |
| First Presbyterian Church of Ellsworth Bldg. Fund | $20,000 |
| Bert's grave maintenance | $ 1,000 |
| Mathilda's grave maintenance | $ 1,000 |
| Central Kansas Medical Center Bldg. Fund, Great Bend | undivided 1/2 interest in remainder |
| Sterling College Memorial Endowment Scholarship Fund, as follows: | undivided 1/2 interest in remainder |

Memorial Scholarship Fund
In Memory of
Bert J. Stratmann
Mathilda Stratmann
Otto Stratmann

Mathilda Stratmann died October 28, 1981, and her 1976 will was probated. Bert received the entire estate valued at $1,360,717.

Edith Oeser became acquainted with the Stratmanns while she worked at the Central Kansas Medical Center where Mathilda was frequently a patient. In 1979, Edith began to occasionally care for Mathilda in the Stratmann home. In November 1981, Bert and Edith began to date. The relationship flourished and culminated in marriage on April 3, 1982, at which time Bert was 81 and Edith was 64.

On November 10, 1983, Bert executed his final will. Under the new will Bert left most of his estate to Edith and her children. Certain property was left in trust with the income to be paid to Edith and her children in designated percentages. After the trust had been in effect for twenty years, the will authorized disposition of the principal and income in the following manner:

Sterling College Memorial Endowment
| | | |
|---|---|---|
| Scholarship Fund | | $ 5,000 |
| or, if Edith is deceased | | $50,000 |

In Memory of
Otto Stratmann
Mathilda Stratmann
Bert J. Stratmann and Edith Stratmann

First Presbyterian Church of Ellsworth Bldg.
| | | |
|---|---|---|
| Fund | | $ 5,000 |
| or if Edith is deceased | | $50,000 |
| Edith Stratmann | undivided ½ interest in remainder | |
| Edith's children individually | undivided ⅙ interest in remainder | |

Bert Stratmann died July 1, 1986, survived by his wife Edith. A petition to admit the 1983 will was filed, but the claimants prevented probate by filing a dissent to the petition wherein claimants alleged breach of the contractual wills. Following a jury trial to determine if claimants were entitled to recover against Bert's estate, the jury found contractual wills existed among Otto, Mathilda, and Bert in 1970, and between Mathilda and Bert in 1976. Edith filed motions for a judgment notwithstanding the verdict, or, in the alternative, a new trial. The motions were denied and Edith appeals.

Preliminary to considering the issues of error raised, let us review the standard of proof required in cases such as this. The burden of proof is placed upon the claimants to establish an agreement existed for mutual and contractual wills among the testators. The trial court instructed the jury that claimants must prove the existence of a

contract by clear and convincing evidence. On appeal, in an unpublished opinion filed June 1, 1990, the Court of Appeals ruled that where the claimant of an alleged contract with a decedent is merely a third-party beneficiary of an alleged mutual contract among several decedents, the claimant need only prove the mutual contract by a preponderance of the evidence. We disagree with the Court of Appeals.

It is well established that in an action against an estate to enforce an oral contract with a person since deceased the existence of the contract must be established by clear and convincing evidence. *Lostutter v. Estate of Larkin,* 235 Kan. 154, 163, 679 P.2d 181 (1984); *In re Estate of Mueseler,* 188 Kan. 407, 409, 362 P.2d 653 (1961); *Jones v. Davis,* 165 Kan. 626, 632, 197 P.2d 932 (1948); *Bond v. Bond,* 154 Kan. 358, 360, 118 P.2d 549 (1941). In these actions the ordinary civil standard of proof of a preponderance of the evidence is insufficient because of the inherent danger of fraud in claims against the estate of a decedent. *Jones v. Estate of Cooper,* 216 Kan. 764, 766, 533 P.2d 1273 (1975); *In re Estate of Shirk,* 194 Kan. 424, 429, 399 P.2d 850, *modified and reh. denied* 194 Kan. 671, 401 P.2d 279 (1965); *Woltz v. First Trust Co.,* 135 Kan. 253, 259, 9 P.2d 665 (1932).

In *Braden v. Neal,* 132 Kan. 387, 295 Pac. 678 (1931), the beneficiary under a contractual will between a husband and wife brought an action to enforce the agreed upon will. The court held that where a definite contract was clearly and certainly established, equity would grant relief to the third-party beneficiary. 132 Kan. at 391. See *Eikmeier v. Eikmeier,* 174 Kan. 71, 254 P.2d 236 (1953).

We find no reason or authority to support the position that the less burdensome standard of proof of a preponderance of the evidence should apply in circumstances where the claimant is a third-party beneficiary of an alleged contract between deceased parties. The temptation to set up fraudulent claims against the estate of a deceased person is not less when the claimant is a third-party beneficiary to the alleged agreement than when the claimant is a direct party to the contract. In fact, it appears logical that the temptation for fraud is greater for a third-party beneficiary. Therefore, we hold the Court of Appeals erred in finding claimants needed to establish evidence of an agreement among Otto, Mathilda, and Bert by a mere preponderance of the evidence. In an action to enforce a contractual

will against the estate of a decedent, the claimants must produce evidence of a clear and convincing nature to establish the existence of the alleged contract.

Now, let us turn to the first substantive issue of error raised on appeal. Edith Stratmann argues the jury verdict that the wills of 1970 and 1976 are contractual is not supported by clear and convincing evidence. In situations such as this, where the trial court found a contract existed, on appeal we review the record to determine if there is substantial evidence to support the finding and, in addition, consider the evidence to determine if it is clear and convincing. *In re Estate of Shirk,* 194 Kan. at 427. In order to establish a contract existed by clear and convincing evidence, the witnesses must be credible and the facts to which they testify must be distinctly remembered and narrated exactly and in due order; the testimony must be clear, direct, and weighty. 194 Kan. at 430.

Edith contends there is no evidence of a contract among the testators. She correctly points out the wills are not expressly contractual and alleges there is no direct testimony of a contract among the siblings. Finally, Edith asserts the only evidence of a contract is general statements of an intent to leave property to the church or college, and such evidence is insufficient to establish the existence of a contract.

Mutual wills made in pursuance of a contract and in consideration of reciprocal provisions do not violate public policy and have long been held valid in Kansas. *Carle v. Miles,* 89 Kan. 540, 543, 132 Pac. 146 (1913). Mutual wills made pursuant to an agreement not to revoke are contractual as well as testamentary in nature and impose an irrevocable obligation on the surviving testator upon the death of the other testator. *In re Estate of Wade,* 202 Kan. 380, 385-86, 449 P.2d 488 (1969). Nevertheless, the contractual will may be revoked and probate prevented. *Menke v. Duwe,* 117 Kan. 207, 216, 230 Pac. 1065 (1924). The revocation breaches the contract, however, so that any beneficiary under the revoked will is entitled to make a claim against the estate of the testator. 117 Kan. at 216.

The existence or nonexistence of a contract is a question of fact. *Reznik v. McKee, Trustee,* 216 Kan. 659, 671-72, 534 P.2d 243 (1975). Claimants must establish by direct or circumstantial evidence that mutual and contractual wills were made in consideration of one another. The contract must be established by full and satisfactory

proof which cannot be supplied by a presumption arising from the fact the wills were mutual. 216 Kan. at 672; *In re Estate of Wade,* 202 Kan. 380, 387, 449 P.2d 488 (1969). Therefore, the fact that the wills contain no reference to a contract is not conclusive, nor can a contract be presumed because two persons simultaneously make reciprocal testamentary dispositions. See *In re Estate of Chronister,* 203 Kan. 366, 372, 454 P.2d 438 (1969); *In re Estate of Miller,* 186 Kan. 87, 96, 348 P.2d 1033 (1960). The terms of the will itself, however, may be circumstantial evidence of a contract and may show by implication, along with other known circumstances such as family relations, that execution of the will was the product of a pre-existing agreement. Finally, the contract must be definite, certain, and unequivocal as to parties, subject matter, and consideration. *Reznik,* 216 Kan. at 674, 678.

As we have already noted, neither the 1970 wills nor the 1976 wills are contractual on their face. Therefore, we must look to circumstantial evidence to determine whether a contract existed among the testators. In 1970, Otto and Bert each executed reciprocal wills wherein the survivors of the three unmarried Stratmann children received the entire estate. In the event Otto and Mathilda predeceased Bert or Bert and Mathilda predeceased Otto, certain named charities received the property in designated percentages. Otto's will, however, included two charities not listed in Bert's will, and provided for different percentages of disposition. Thus, although the wills are similar they are not identical.

The 1976 wills of Bert and Mathilda are mutual, reciprocal, and identical in all substantive aspects. The testator left his or her entire estate to the other and bequeathed the residue to the same charities under the will of the survivor.

The reciprocal and similar provisions of these wills is indicative of an overall pattern of disposition of the family estate. See *Reznik,* 216 Kan. at 674; *Chronister,* 203 Kan. at 373. In addition, the 1976 wills made by Bert and Mathilda expressed their specific intent to omit other heirs. However, the 1970 wills of Otto, Bert, and Mathilda fall in a much weaker position since those wills are not mutual and Mathilda's 1970 will was not produced at trial. We have only oral testimony concerning its contents.

Oral testimony at trial can provide circumstantial evidence of contractual wills. Testimony of Bert and Mathilda which had been given

during the probate of Otto's will was read into evidence at this trial. Mathilda had testified she and Otto executed the 1970 wills on the same date and that neither of them asked the other to make a will, but that for some time they had discussed leaving their property to the other. There was no direct evidence of a contract. Bert, however, testified he did not know that Otto and Mathilda were planning to make new wills in 1970, and did not gain such knowledge until after the wills were executed. Bert indicated he decided on his own to make a similar will with a few changes.

Reverend William McCreery testified he met with Otto, Mathilda, and Bert in the spring of 1970 in an effort to cultivate interest in Sterling College. After meeting with the Stratmanns, McCreery felt they were going to do something for the college but did not receive a definite commitment on the amount of their contribution. Although the Stratmanns did not state they had a contractual agreement, McCreery held the opinion they were in agreement on helping the college and at one point Bert told him the college was taken care of in the "Stratmann Estate."

Sister Miriam Schremmer testified that she visited with Bert while Mathilda was a patient at the Central Kansas Medical Center. Bert told Sister Schremmer they were going to do something nice for the hospital because its staff was nice to Mathilda.

Reverend Don Ray, pastor for the First Presbyterian Church of Ellsworth, testified that Otto, Mathilda, and Bert acted as a team. Reverend Ray made regular calls on the Stratmanns and from conversations with them believed they intended to do something for Sterling College; however, no specific amounts or percentages were ever given. On one specific occasion, in response to a request for a $70,000 gift for an organ for Sterling College, Bert told Reverend Ray, "No, you will get our money when we die."

Edith contends the testimony presented general statements of an intent to give property to the church or college, which are not sufficient to establish the existence of a contract. In *Jones v. Estate of Cooper,* 216 Kan. 764, 767-68, 533 P.2d 1273 (1975), we held that definite evidence of an alleged contract with a decedent must be produced and the claimant could not rely merely upon witnesses' testimony of the decedent's intent to devise property as a reward for claimant's services. 216 Kan. at 767-68.

John O'Donnell, an attorney who represented the Stratmanns for many years, testified that Otto, Bert, and Mathilda owned and dealt with most of their property separately and distinctly. O'Donnell stated that Otto and Mathilda were not present when Bert executed his 1970 will, nor did Bert indicate to him the existence of a contract. Otto also made no mention to O'Donnell about any contractual arrangement when he executed his 1970 will.

Thus, we are presented from the foregoing facts with the question of whether there is clear and convincing evidence the Stratmanns contracted among themselves, each to the other, to will their property as the three of them did in 1970 or as Bert and Mathilda did in 1976.

Let us first examine the 1970 wills. The wills were not mutual and reciprocal in all respects between Otto and Bert, and from Bert's preserved testimony from the probate hearing in Otto's probate we know that Bert and Otto had no contract. There is no evidence to support a conclusion that there was a contract. John O'Donnell, the attorney who drafted the wills, testified there was no contractual arrangement among the Stratmanns. He said had there been one he would have so stated in their wills. Claimants' failure to produce direct testimony of a contract and O'Donnell's testimony are persuasive. We hold there was no contract among the Stratmanns in the 1970 wills. Had a contract existed, it would have rendered any subsequent wills ineffective.

Now we turn to the 1976 wills of Bert and Mathilda. These two wills are clearly mutual and reciprocal and show that the two testators saw the proper disposition of their estates the same way at that time. The question presented is: Does that mutuality constitute a contract which precludes each of them from changing their will thereafter, absent agreement by the other?

We stated in *In re Estate of Pennington*, 158 Kan. 495, Syl. ¶ 1, 148 P.2d 516 (1944):

"The separate wills of two persons which are reciprocal in their provisions giving the property of each to the other are not inherently contractual, where the wills do not so declare, and where there is no evidence of an agreement by the testators to that effect."

We amplified the *Pennington* holding in *In re Estate of Miller*, 186 Kan. 87, 95, 348 P.2d 1033 (1960), stating:

"To establish an agreement for mutual wills there must be full and satisfactory proof of the agreement, which cannot be supplied by presumption. Merely to argue that wills are contractual because they are mutual begs the question. The contractual character of a will is a fact to be established by evidence, showing that such was the understanding and the deliberate agreement.

"It is essential to the validity and enforcement of a contract for the execution of wills containing bequests which are reciprocal between the parties that the contract be definite, certain and unequivocal as to the parties, the subject matter and the considerations."

As we previously stated, neither of the 1976 wills contain a reference to a contract, nor do we have any information from the testators which asserts a contract. Thus, we must search the extrinsic evidence for guidance. To prevail, the claimants must produce evidence that Bert and Mathilda each intended their 1976 mutual wills to be binding on both of them and that they understood the consequences of such agreement and that they so agreed deliberately. We have no direct evidence on any of these points. Rather, the will draftsman, Attorney Ed Moses, testified to the contrary. He says nothing about a contract was mentioned to him by either testator. Thus, we must examine the testimony of the claimants. Does it provide any contract information which is definite, certain, and unequivocal as to parties, subject matter, and consideration and which is clear, direct, and weighty? Our thorough search of the record reveals no evidence of a contract, let alone evidence which meets the requirements of the contract being definite, certain, unequivocal, clear, direct, and weighty.

The claimants have the burden of proving the wills were contractual by clear and convincing evidence. They failed to produce witnesses who distinctly remembered and narrated exactly and in due order, and whose tsetimony was clear, direct, and weighty that a contract existed between Bert and Mathilda Stratmann. Thus, the claimants failed to sustain the burden of proof. There was insufficient evidence of a contract to submit that issue to the jury.

Bert Stratmann's 1983 will is not subject to the contractual claim of appellees. The other issues raised need not be discussed.

The judgments of the trial court and the Court of Appeals are reversed and judgment is entered for appellant.

ABBOTT J., not participating.

SIX, J., concurring and dissenting: I agree with the majority that the standard of proof should be clear and convincing evidence under the instant fact situation. The trial court determined the clear and convincing standard applied and so instructed the jury.

I detach myself from the majority's observation: *"In fact, it appears logical that the temptation for fraud is greater for a third-party beneficiary."* The majority's observation relates to the distinction made by the Court of Appeals between litigation involving a claimant who allegedly contracted with the decedent to perform services in exchange for a promise to leave the claimant property in decedent's will (the oral promise must be proved by clear and convincing evidence), and situations similar to the case at bar (claimants are third-party beneficiaries to an alleged mutual will contract among several decedents). In my view, the former is more susceptible to fraud than the latter. In the beneficiary situation, as in the case at bar, written evidence is present (the will in question and the will or wills forming the basis of the alleged contract).

I dissent from the majority's reversal of the jury verdict. The majority has, contrary to the verdict of the jury and the ruling of an experienced trial judge, entered judgment for appellant Edith Stratmann, holding that Bert Stratmann's 1983 will is not subject to the contractual claims of appellees as third-party beneficiaries.

The majority has applied an incorrect scope of review.

What is the scope of review for this court, in the instant litigation, as it rewalks the path of the jury, the trial judge, and the Court of Appeals?

The answer is found in the opinion of Justice McFarland, speaking for the court, in *Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). *Krause* picks up the cardinal thread of the judicial review fabric woven in *In re Estate of Shirk,* 194 Kan. 424, 399 P.2d 850 (*Shirk I*), *modified and reh. denied* 194 Kan. 671, 401 P.2d 279 (1965) (*Shirk II*).

"Clear and convincing evidence is not a quantum of proof, but rather a quality of proof; thus, the plaintiff establishes fraud by a preponderance of the evidence, but this evidence must be clear and convincing in nature.

*On review, this court considers only the evidence of the successful party to determine whether it is substantial and whether it is of a clear and convincing quality."* (Emphasis added.) *Krause,* 239 Kan. at 557.

The majority relies on *Shirk I* as its guide for establishing the scope of review. 194 Kan. at 427. ("On appeal we review the record to determine if there is substantial evidence to support the finding and, in addition, consider the evidence to determine if it is clear and convincing.") The *Shirk I* inquiry is incomplete. Without *Shirk II,* the reader is misled and the evidentiary focus of the appellate court's scope of review is either obscured or "off target." *Shirk I* and *Shirk II* must be read as one opinion for identification of the proper scope of review.

In fact, *Shirk II* sends out the dominant signal. In *Shirk II,* this court was confronted with a motion for rehearing addressing the language of *Shirk I.* The *Shirk I* appellee, who won in the trial court on an oral agreement claim against an estate but lost in this court, filed a motion for rehearing. The motion challenged the language of *Shirk I* dealing with the quality of evidence required to meet the clear and convincing test necessary in establishing an oral contract with a deceased person.

We denied the motion for rehearing but extended the *Shirk I* opinion; consequently, the two opinions must be read together. This the majority has failed to do. The pithy extension of *Shirk II* instructs us on the scope of review:

"It was not the intention of this court to depart from the long established rule that it would not weigh evidence on appeal. . . . In reviewing the record for the purpose of determining whether there is clear and convincing evidence to support the judgment this court does not weigh the evidence." 194 Kan. at 672.

After repeating the admonishment "not to weigh the evidence," *Shirk II* tells us what to do in the case at bar. We are to consider *"only the evidence of the successful party for the purpose of determining whether it is substantial and of that quality required to be clear and convincing."* (Emphasis added.) 194 Kan. at 672.

John O'Donnell was Edith Stratmann's witness. O'Donnell's testimony was not evidence of the successful party. The charities prevailed. The jury found that a contract existed.

The majority not only relies on the testimony of John O'Donnell, but also characterizes it as "persuasive." In its opinion, the

majority has the following to say about the evidence of the *un-successful* party as that evidence relates to the 1970 wills of Otto, Bert, and Mathilda Stratmann:

"John O'Donnell, an attorney who represented the Stratmanns for many years, testified that Otto, Bert, and Mathilda owned and dealt with most of their property separately and distinctly. O'Donnell stated that Otto and Mathilda were not present when Bert executed his 1970 will, nor did Bert indicate to him the existence of a contract. Otto also made no mention to O'Donnell about any contractual arrangement when he executed his 1970 will.

"Thus, we are presented from the foregoing facts with the question of whether there is clear and convincing evidence the Stratmanns contracted among themselves, each to the other, to will their property as the three of them did in 1970 or as Bert and Mathilda did in 1976.

"Let us first examine the 1970 wills. The wills were not mutual and reciprocal in all respects between Otto and Bert, and from Bert's preserved testimony from the probate hearing in Otto's probate we know that Bert and Otto had no contract. There is no evidence to support a conclusion that there was a contract. John O'Donnell, the attorney who drafted the wills, testified there was no contractual arrangement among the Stratmanns. He said had there been one he would have so stated in their wills. Claimants' failure to produce direct testimony of a contract and O'Donnell's testimony are persuasive. We hold there was no contract among the Stratmanns in the 1970 wills. Had a contract existed, it would have rendered any subsequent wills ineffective."

The majority observes that the existence or nonexistence of a contract is a question of fact, citing *Reznik v. McKee, Trustee,* 216 Kan. 659, 671-72, 534 P.2d 243 (1975). I agree.

The jury was instructed (No. 6):

"In reviewing the evidence as presented in the terms of the will, you should put yourself as nearly as possible in the situation of the testator (person making the will) when he or she made the will and may take into consideration all other evidence admitted in this case in attempting to put yourself in such a position to determine what the testator's actual intent was at the time the will was executed."

The jury in a special verdict form proposed by counsel for Edith Stratmann found the 1970 wills of Otto, Bert, and Mathilda to be contractual.

"We, the jury, present the following answers to the questions submitted by the Court:

"1. Do you find that a contract was entered into prior to July 16, 1970, among Bert, Otto and Mathilda Stratmann, whereby they contractually

bound themselves that the last of them to die would leave all of their property to the following claimants in the following percentages:

| | |
|---|---|
| "Lutheran Society Good Samaritan Home | 10% |
| "Central Kansas Medical Center | 10% |
| "First Presbyterian Church of Ellsworth | 25% |
| "Sterling College | 45% |
| "Ellsworth County Veterans Memorial Hospital | 10% |

and thus Bert Stratmann could not change his Will after the deaths of Otto Stratmann and Mathilda Stratmann and the provisions of his November 10, 1983 Will should be given no effect?

"ANSWER: YES __X__ NO ____"

The jury also found the 1976 wills of Bert and Mathilda to be contractual by indicating "yes" on a similar verdict form proposed by Edith Stratmann.

The trial judge in his memorandum of decision on the post-trial motions of Edith for judgment notwithstanding the verdict or in the alternative motion for a new trial reasoned:

"There can be no argument that *the burden of proof in a case of this nature is on the Claimants, that it must be clear and convincing evidence.*

"Further in a Motion for Judgment Notwithstanding The Verdict, all evidence is construed most favorable to the party against whom the motion is directed.

"In a motion for a new trial, the Court must make an overview of all the evidence and use its sound discretion as to whether there was error and, if so, whether such error was so prejudicial as to warrant a New Trial.

"Both sides have filed lengthy briefs, reply briefs, and the Court heard lengthy arguments several months ago. The Court has reviewed all briefs along with a transcript of the Arguments made on October 6, 1988. *It would seem to the Court that the sole issue is: "whether there was evidence presented of a clear convincing nature that Otto, Mathilda and Bert made an agreement as to exactly how their property was to be ultimately disposed of."* (Emphasis added.)

*Krause* instructs that clear and convincing evidence is not a quantum of proof but rather a quality of proof. The charities must establish a contract between Otto, Bert, and Mathilda by a preponderance of the evidence—evidence which carries the quality of "clear and convincing." See 239 Kan. at 557. *Shirk II* and *Krause* direct us to consider only the evidence of the successful parties; in this case, the charities. *Shirk II* offers further assistance in resolving the instant case. The trial court must be satisfied that the evidence is clear and convincing. 194 Kan. at 672. Here,

the trial court was satisfied. The trial court gave the jury the clear and convincing instruction from PIK Civ. 2d 2.11.

*Shirk II* observes: "It may be said that in every case the trier of facts must be satisfied with the evidence, there must be some evidence to support the findings, and on appeal it will be presumed that the findings are supported by evidence unless there is a showing to the contrary." 194 Kan. at 672. The charities, as would all appellees similarly situated, arrive here with the benefit of the *Shirk II* presumption.

Let us consider the evidence of the successful parties.

The threshold for departure is the observation of the trial judge in his memorandum decision on the Edith Stratmann post-trial motions: "Otto, Mathilda and Bert Stratmann were the unmarrieds in the Stratmann family, they lived together on the homestead where they grew up. They together amassed a sizeable fortune. To put it mildly they did not get along with their three brothers who had married."

The similarities among the wills of the three single siblings provide circumstantial evidence that an agreement was reached. Additional circumstantial evidence of a contract is provided by the consideration of the three that their property was a part of one Stratmann estate, even though they held property separately. Together they listened to representatives from the charities as the representatives attempted to solicit funds. They made their wills at, or near, the same times. Over the years, as they revised their wills, the provisions among them were always similar or identical.

The first wills drawn by Bert, Otto, and Mathilda (the singles) were drawn approximately 20 days after their mother's death in June of 1960. The singles drew their first identical wills in April of 1963. All of the wills excluded the married siblings completely.

Otto and Mathilda were together when one another's 1970 wills were prepared and signed. Mathilda stated during a deposition that they made the 1970 wills to protect themselves. She testified that the threesome agreed to give their property to each other at that time after talking about it "quite awhile."

The Stratmann family was characterized by intense conflict. Bert, Otto, and Mathilda had nothing to do with the three married siblings. The conflict continued over a period of many years.

When Chris Stratmann, the oldest sibling, was married in the 1920's, the family forced him to move. Ervin, the second to marry, was also forced off into another county when he was married. Ervin was barred from visiting the homestead. The third to marry was Marvin. Otto, Bert, and Mathilda, refused to permit his fiance into their home.

The singles not only avoided the marrieds but also sued them. The history of the singles versus the marrieds was before the jury. The extreme nature of the hostile relationship is represented by a suit filed by the singles against the marrieds over the ownership of a plow. The litigious flavor of the singles/marrieds relationship surfaced in this court. *Stratmann v. Stratmann,* 204 Kan. 658, 465 P.2d 938 (1970) (Bert, Otto, and Mathilda against Ervin and his wife Sybil in a quiet title case involving royalty interests).

Otto died in August 1973 at the Central Kansas Medical Center. More litigation followed. The marrieds filed a will contest against Otto's estate. The claim was settled. The remaining singles executed codicils to their wills noting that the exclusion of the marrieds, their spouses, and offspring was intentional. In July 1975, Marvin and Ervin (two marrieds) sued Bert, who acted as executor of the Estate of Tena Stratmann, for fraud and for holding bearer bonds that should have been inventoried in the estate. In 1978, Marvin (a married) filed suit against Bert and Mathilda to quiet title to an oil royalty interest Bert was claiming. See *Stratmann v. Stratmann,* 6 Kan. App. 2d 403, 628 P.2d 1080 (1981).

The singles attended the First Presbyterian Church in Ellsworth. Reverend Ray, their pastor, knew Otto, Bert, and Mathilda well. The singles lived in the same house, ate meals together, and conducted their finances together. Reverend Ray testified that the singles acted as a team. He stated that they did not have any heirs and they did not care for anyone else to have their money besides them.

Reverend Ray stated that he knew if any of the three singles ever married they would be "cut out" by the others. He had no recollection of any of the threesome even dating anyone, and he noted that the singles had purchased cemetery plots so that they

could be buried together. The jury could find that the singles anticipated each other remaining single until their death.

Reverend Ray was also on the Board of Directors of Sterling College, a Presbyterian college in Sterling, Kansas, and was an alumni of the school, as were all six of his children. Reverend Ray, knowing that the singles had substantial assets and that they were interested in Christian education, introduced them to the President of Sterling College, Dr. William McCreery. Dr. McCreery first met the singles in the spring of 1970 prior to their new wills being drawn. He called on the singles in their home. He was there as a "salesman" for the college. He spoke with them about what they might do to help the college and its students. He told them that they could make a permanent contribution to the college which would fund scholarships for Christian students in perpetuity.

The singles were excited about the idea of a Stratmann Scholarship at Sterling College, so that their names would live in perpetuity. During one of the visits, Bert told Dr. McCreery that the college had been "taken care of" in the estate. When Reverend Ray asked for some money for Sterling College prior to the deaths of the singles, Bert told him, "No, you're going to get our money when we die." The money was referred to as "our money." Reverend Ray responded: "I took their word the fact is if Bert said he would give me a million dollars I would probably go out and start buying things on time because his word was good." Reverend Ray informed the Board of Directors of Sterling College that it would be receiving $1.5 million or more from the Stratmann Estate.

The singles had few close friends. They were good friends with Reverend Ray and his wife. Reverend Ray had testified in court for the singles in the past. He knew them well and ministered to their spiritual needs for over 20 years. When Reverend Ray would visit with the singles, he would visit with all three at the same time. The singles acted as a team.

Mathilda was admitted to the Central Kansas Medical Center 45 times. Mathilda was a rather shy person. She seemed lonely and depressed during her stays at the hospital. Sister Miriam spent a lot of time visiting with her. Mathilda often asked Sister Miriam to pray with her.

Whenever Mathilda was admitted to the hospital, Bert would bring her. He would also take her home upon being dismissed. He visited her regularly. Sister Miriam recalled one particular visit with Bert. During the conversation, according to her testimony:

"[T]hen he went on to tell me also that on the many admissions that there was for Mathilda he said we were always so nice to her and we did many nice things for her, and when she was there for awhile she always came out of her depression and she always felt better. The nurses and everyone always made her feel so much better that she was able to go back home and function again for awhile . . . . And he proceeded on to tell me that they're going to do something nice and they're going to remember us when the occasion comes to . . . . He just told us that they were gonna do something nice for us. He said we are going to do something nice for you because you have been so nice to Mathilda every time she comes to the hospital."

Otto and Mathilda predeceased Bert. Both estates passed by will to the surviving single. At age 81, shortly after Mathilda's death, Bert, the last of the singles, married Edith Oeser.

Edith was a nurse's aide at the hospital. She had known Bert due to prior hospitalizations of Otto and Mathilda. Edith had also helped Mathilda in the family home on various occasions. Edith had been married for 44 years before her divorce in 1980. Edith was 62. Her first date with Bert was in November 1981, less than a month after Mathilda's death. Bert told his nephew Larry that Edith wanted to get married in the spring and she was moving her stuff out to the farm. Edith and Bert were married in April 1982, less than six months after Mathilda's death.

In October 1981 when Mathilda died, her estate was valued at approximately $1.3 million. She was buried side by side with her brother Otto. The singles had purchased three cemetery plots at a local cemetery so they could all be buried together. There was a large tombstone which said "Stratmann," and small markers for the individual graves of Otto and Mathilda. Bert planned to have his marker installed upon his death.

Bert died at home in July of 1986. He was buried in a different cemetery from Otto and Mathilda. The plot next to Otto and Mathilda's graves is empty.

The jury heard evidence during a four-day trial. The wills as documentary evidence were considered.

The challenge in this case asserted by Edith is to the jury's finding of fact. The existence or nonexistence of an agreement underlying contractual wills is a question of fact.

Had I been the trier of fact, I might not have found as the jury did. This court, however, must review evidence with deference to the jury's findings.

I cannot say that the jury erred when there is circumstantial evidence to support its findings. Applying our scope of review from *Shirk II* and *Krause* (considering only the evidence of the charities, the successful parties), I would hold a contract had been established by a preponderance of the evidence and that the evidence is clear and convincing in nature. Substantial evidence of a clear and convincing quality exists to support the jury verdict.

I would affirm the trial court and the result reached by the Court of Appeals.