### UNITED CITIES GAS COMPANY, Plaintiff,

v.

### BROCK EXPLORATION COMPANY et al., Defendants.

No. CIV. A. 97–2113–GTV.

United States District Court,
D. Kansas.

Feb. 26, 1998.

James G. Flaherty, Anderson, Byrd, Richeson & Flaherty, Ottawa, KS, for Plaintiff.

J. Scott Pohl, Hinkle, Eberhart & Elkouri, L.L.C., Steven D. Gough, John G. Pike, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for Defendants.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

Plaintiff brings this action seeking damages from defendants' unlawful sales of natural gas within plaintiff's certificated service area. The case is before the court on plaintiff's motion for partial summary judgment (Doc. 43) and defendants' motion for summary judgment (Doc. 47), both of which raise a variety of issues. For the reasons set forth below, the court finds that: (1) plaintiff may maintain a cause of action under K.S.A. 66–176; (2) genuine issues of material fact remain with respect to the causation and amount of plaintiff's damages; (3) plaintiff has no right to prejudgment interest; and (4) defendants are precluded from raising their equitable defenses.

### I. Background

In 1988, defendant Brock Exploration Company [1] purchased oil and gas leases, nat-

---

1. The remaining defendants—Brock Gas Systems & Equipment, Inc., Brock Oil & Gas Corporation, and R.E. Martin Oil Company—are either subsidiaries or predecessors-in-interest to Brock Exploration Company. For purposes of this Order, the court will refer to, and treat, the companies as one collective entity.

ural gas wells, and a gathering system from local producers in Johnson County, Kansas. Brock sold natural gas from these wells to three industrial customers with plants located at or near the Johnson County Industrial Airport. In 1990, Brock also obtained a tap on the Williams Natural Gas Company's interstate pipeline and transported gas from its own wells in Oklahoma to the tap for later resale to its industrial customers in Johnson County.

Each of Brock's industrial customers— Dazey Corporation, Grindsted Products, Inc., and Superior Asphalt—are located within the "certificated area" of plaintiff United Cities Gas Company. A "certificated area" is a region in which the Kansas Corporation Commission ("KCC") has granted a common carrier or public utility the authority to transact business falling within the Commission's regulatory jurisdiction. *See* K.S.A. 66–104 (discussing entities and activities subject to KCC's supervision). The KCC confers this authority by issuing a certificate of convenience and necessity. *See* K.S.A. 66–131.

In May 1987, approximately one year before Brock purchased the oil and gas infrastructure described above, Union Gas System, Inc., plaintiff's predecessor-in-interest, entered into a gas purchase contract with Williams Production Company in which Williams promised to sell unspecified quantities of natural gas to Union Gas. The contract also contained a provision in which Williams specifically reserved its right to sell natural gas to certain other customers including Dazey Corporation.

During the time in which Brock sold natural gas directly to its customers near the industrial airport, United Cities sought to negotiate sales contracts with those same companies. Each company, however, rejected United Cities' proposals. Dazey and Grindsted both felt that it would be cheaper to construct their own pipelines from their plants to the Williams Natural Gas Company's interstate pipeline than it would be to have gas delivered through United Cities' local distribution facilities.[2] Superior Asphalt believed that because United Cities' pipeline did not extend to Superior's plant,

the construction expenditure necessary to obtain service from United Cities would outweigh any price savings. Superior further reasoned that its ability to use a fuel source other than natural gas to perform its operations justified a declination of United Cities' offer. At all times relevant to this case, none of Brock's industrial customers utilized the alternative fuel sources to which they had access. Instead, each continued to purchase natural gas directly from Brock.

On September 26, 1995, United Cities filed a complaint with the KCC alleging that Brock had contravened the Kansas Public Utilities Act, specifically K.S.A. 66–131, by transacting the business of a public utility without obtaining the requisite certificate of convenience and necessity. On May 29, 1996, following full briefing and an evidentiary hearing, the KCC issued an Order concluding that Brock's sales of natural gas in the industrial airport area constituted the business of a public utility and requiring Brock to obtain a certificate of convenience and necessity. *See* KCC Docket No. 193,478–U. The KCC further determined that Brock's operations amounted to a bypass of United Cities' local distribution facilities. A "bypass" occurs when an end-user in a local distribution company's certificated service area obtains natural gas in a manner that circumvents the existing local distribution company. The KCC held that because Brock had provided insufficient evidence to support an exception to the Commission's bypass policy, Brock could continue delivering natural gas to its customers in the Johnson County Industrial Airport area only by utilizing United Cities' distribution facilities.

Brock subsequently petitioned for a reconsideration of the KCC's Order. On July 8, 1996, although denying Brock's petition, the KCC clarified its prior Order. The KCC noted that if Brock did not change its operations in any way, the company would have to secure a certificate of convenience and necessity to operate as a public utility; if, however, Brock chose to deliver natural gas directly to United Cities' local distribution facilities

---

**2.** As an *interstate* pipeline, Williams Natural Gas Company is outside the regulatory control of the KCC. The KCC has jurisdiction only over *intra-* *state* pipelines. Interstate pipelines are governed by the Federal Energy Regulatory Commission.

for subsequent redelivery to Brock's customers, Brock would be functioning as a gas marketer rather than a public utility and would need no certificate from the KCC.

On August 6, 1996, Brock appealed the KCC's Orders to the Shawnee County, Kansas District Court. On June 24, 1997, Shawnee County District Judge Terry L. Bullock issued an opinion upholding the KCC's findings. Brock did not appeal the state court ruling.

After the KCC issued its ruling, Brock undertook a number of actions in an attempt to legitimize its distribution system. On December 1, 1996, Brock terminated all its natural gas sales to Dazey. On March 20, 1997, Brock sold to Grindsted[3] its tap and connecting pipeline to the William Natural Gas Company's interstate pipeline. That same day, Brock entered into a gas purchase contract with Grindsted. On April 11, 1997, Brock reconfigured its distribution system with the intent of continuing sales to Grindsted and Superior Asphalt without having to qualify as a public utility.

Plaintiff denies that this new distribution system excuses Brock from any public utility statutory requirements. Specifically, plaintiff contends that Brock's infrastructure does not constitute a "gathering system" under K.S.A. 55–150(d) (Supp.1996). Plaintiff filed a complaint with the KCC in 1997 addressing this issue and the matter remains pending before the Commission.

On November 7, 1996, while Brock's appeal of the KCC's July 1996 Order was still before Judge Bullock, United Cities filed the instant action in the Shawnee County District Court. Brock removed the case to federal court on March 3, 1997 after obtaining a particularized statement of United Cities' requested damages.[4]

## II. Summary Judgment Standards

In deciding a motion for summary judgment, the court must examine any evidence tending to show triable issues in the light most favorable to the nonmoving party. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.

1984). A moving party is entitled to summary judgment only if the evidence indicates "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine factual issue is one that "can reasonably be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing" that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

## III. Discussion

 Acknowledging that challenges to Orders of the KCC must be directed either to the Commission itself or to a state court on direct review, *see Kansas–Neb. Natural Gas Co., Inc. v. State Corp. Comm'n,* 176 Kan. 561, Syl. ¶ 4, 271 P.2d 1091 (1954), defendants do not dispute in this action any of the KCC's prior determinations. Defendants, however, do challenge plaintiff's right to maintain an action under K.S.A. 66–176 as well as plaintiff's entitlement to damages. Plaintiff insists that not only may it pursue an action under K.S.A. 66–176, but that it is entitled to damages and prejudgment interest as a matter of law. The court will address each of these issues in turn.

---

**3.** Danisco Ingredients USA, Inc. purchased Grindsted prior to this sale. For purposes of simplicity, however, the court will continue to refer to the company as Grindsted.

**4.** The court's jurisdiction is predicated on the parties' diversity of citizenship. *See* 28 U.S.C. § 1332.

### A. Plaintiff's Right to Maintain Action Under K.S.A. 66–176

■ Defendants contend that plaintiff's suit must be dismissed because K.S.A. 66–176 does not create a cause of action in favor of public utilities. Citing various dictionary definitions of the word "aggrieved," defendants claim that plaintiff is unable to demonstrate the denial of a legal right and, therefore, has no remedy under the statute. The court rejects this argument. K.S.A. 66–176 provides in relevant part:

> Any public utility or common carrier which violates any of the provisions of law for the regulation of public utilities or common carriers shall forfeit, for every offense, to the person, company, or corporation aggrieved thereby, the actual damages sustained by the party aggrieved, together with the costs of suit and reasonable attorney fees, to be fixed by the court.

*Id.* (Supp.1996). Despite having been on the books for nearly 115 years, only a handful of cases have interpreted the scope of this statute. Nevertheless, the courts have held universally that the statute is intended to confer a private cause of action upon any party injured by the wrongful acts of a public utility or common carrier. *See Grindsted Prods., Inc. v. Kansas City Power & Light Co.,* 21 Kan.App.2d 435, 439–42, 901 P.2d 20, 23–25 (1995); *Dietz v. Atchison, Topeka & Santa Fe Ry. Co.,* 16 Kan.App.2d 342, 346–47, 823 P.2d 810, 814–15 (1991); *Western Kan. Express, Inc. v. Dugan Truck Line, Inc.,* 11 Kan.App.2d 336, 339–41, 720 P.2d 1132, 1135–1136 (1986) (per curiam); *see also Beadle v. Kansas City, F. S. & M. R. Co.,* 51 Kan. 248, 251–52, 32 P. 910, 911 (1893).

Defendants' attempt to distinguish these cases is unpersuasive. The majority of cases that defendants cite in their briefs not only predate the formation of the KCC, but involve injunctive actions that bear no similarity to the case at bar. *See, e.g., Wichita Transp. Co. v. People's Taxicab Co.,* 140 Kan. 40, 34 P.2d 550 (1934); *Baxter Tel. Co. v. Cherokee County Mut. Tel. Ass'n,* 94 Kan.

159, 146 P. 324 (1915). The only restriction Kansas courts have imposed upon litigants bringing suit under K.S.A. 66–176 is that an action may not be filed until the KCC has determined that the defendant violated a law governing the regulation of common carriers or public utilities.[5] *See Grindsted Prods.,* 21 Kan.App.2d at 441–442, 901 P.2d at 24–25. Plaintiff, having secured the requisite finding of a violation of the laws regulating public utilities from the KCC, may now pursue its damages action against defendants under K.S.A. 66–176.

### B. Plaintiff's Right to Damages

The Kansas Court of Appeals has held that actions predicated on K.S.A. 66–176 seeking damages for violations of common carrier or public utility regulatory provisions are properly treated as negligence per se claims. *Dietz,* 16 Kan.App.2d at 345–347, 823 P.2d at 814–15; *Western Kansas Express,* 11 Kan. App.2d at 338, 720 P.2d at 1134. The court grounded this conclusion on the theory that the Kansas legislature intended many of the applicable regulatory provisions to do more than merely protect the general public; rather, by enacting K.S.A. 66–176, the legislature intended to confer an individual right of action upon parties injured by the violation of these regulations. *Dietz,* 16 Kan.App.2d at 345–47, 823 P.2d at 814–15 (citations omitted).

#### 1. "Negligence" vs. "Negligence Per Se" Claims

■ There is a fundamental dichotomy between "negligence" and "negligence per se" claims. The Kansas Supreme Court describes the distinction in terms of the claims' unique means and methods of ascertainment. Specifically, negligence claims must be found from the evidence by a trier of fact, while negligence per se claims result from a violation of a specific statute, regulation, or ordinance. *Cerretti v. Flint Hills Rural Elec. Coop. Ass'n,* 251 Kan. 347, 356, 837 P.2d 330,

---

5. In certain damage actions involving common carriers for which there is no administrative remedy available from the KCC, an aggrieved party may bring suit directly in district court without exhausting any administrative remedies before the KCC. *See Dietz,* 16 Kan.App.2d at 346–

47, 823 P.2d at 814–15. With public utilities, however, the KCC must make a threshold statutory violation determination before an aggrieved party may commence an action in district court. *Grindsted Prods.,* 21 Kan.App.2d at 442, 901 P.2d at 25.

338 (1992) (citing *Kendrick v. Atchison, Topeka & Santa Fe R. Co.*, 182 Kan. 249, 260, 320 P.2d 1061, 1070 (1958)). With negligence per se claims, the critical question for the trier of fact is whether the defendant contravened a relevant statutory provision. *Id.*

### 2. Causation

■ Once it has been determined that the defendant violated a statute for which the legislature intended a private remedial cause of action, the trier of fact must determine whether the plaintiff's damages resulted from that violation. *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 339, 918 P.2d 1274, 1296 (1996).

#### a. Requisite Proof of Causation

■ To recover in any type of negligence action, a plaintiff must prove that the defendant's breach of duty was the actual and proximate cause of its injuries. *Baker v. City of Garden City*, 240 Kan. 554, 557, 731 P.2d 278, 280 (1987). A defendant's conduct is the actual or cause in fact of the plaintiff's injuries if such conduct was a "substantial factor" in bringing about the plaintiff's harm. *Roberson v. Counselman*, 235 Kan. 1006, 1011–12, 686 P.2d 149, 153–54 (1984) (citing Restatement (Second) of Torts § 431 (1965)). A defendant's conduct is the legal or proximate cause of the plaintiff's harm if such conduct, "in natural and continuous sequence, unbroken by an efficient intervening cause," produces the plaintiff's injuries and "without which the injur[ies] would not have occurred, the injur[ies] being the natural and probable consequence of the wrongful act." *Baker*, 240 Kan. at 557, 731 P.2d at 280. These causation issues are normally questions for the jury, although the court may resolve them on summary judgment if the facts are susceptible to only one inference. *Id.*, 731 P.2d at 281.

■ Both parties insist that they are entitled to summary judgment on the issue of causation. Plaintiff contends that it has a right to damages as a matter of law because

Brock's customers would have had to purchase their natural gas requirements from plaintiff had Brock not engaged in illegal sales in the industrial airport area. This assertion is incorrect; Brock's customers were under no such obligation. Defendants maintain that Brock's customers would have turned to other natural gas suppliers or alternative fuels before purchasing natural gas from plaintiff. Although defendants' scenario is possible, it is by no means certain.

■ The court concludes there are genuine issues of material fact with respect to the existence and causation of plaintiff's damages. Restatement (Second) of Torts § 432(1) provides that except in certain situations not applicable here, an "actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent." Moreover, when seeking lost profit damages, a plaintiff may recover only by demonstrating that such profits were reasonably "certain" to have flowed from the defendant's conduct. *Billups v. American Sur. Co.*, 173 Kan. 646, 649, 251 P.2d 237, 240 (1952). At trial, plaintiff will have to prove that if Brock had not sold natural gas to Dazey, Grindsted, and Superior Asphalt, those companies would have turned to plaintiff for their natural gas needs. Defendants will be free to argue in defense that plaintiff's refusal to discount its rates to a level competitive to Williams Natural Gas Company or alternative fuel source providers would have discouraged the three companies from purchasing natural gas from plaintiff even in the absence of direct sales from Brock.[6] Although defendants have introduced uncontroverted evidence that Brock's customers rejected all of plaintiff's contract proposals between October 1992 and March 1997, Brock's absence from the scene may have altered the negotiations significantly. A jury must sort out this issue.

---

6. The court assumes that plaintiff's discounted rates would either fall within the rate schedule previously approved by the KCC or would be approved by the KCC in a subsequent application. The court operates under this assumption inasmuch as K.S.A. 66–109 ordinarily prohibits public utilities from charging customers amounts different than published rates. *See Sunflower Pipeline Co. v. State Corp. Comm'n*, 5 Kan.App.2d 715, 718–19, 624 P.2d 466, 469–70 (1981).

### b. Retroactive Ratemaking

Defendants further contend that plaintiff cannot prove any damages because it is uncontroverted that plaintiff earned a reasonable rate of return on its investment. Although somewhat appealing upon first impression, this theory crumbles easily upon closer examination. A brief discussion of the retroactive ratemaking doctrine will illuminate defendants' argument and underscore why it does not bar plaintiff's recovery.

 In Kansas, the regulation of public utilities is a legislative rather than judicial function. *Grindsted Prods., Inc. v. Kansas Corp.*, 262 Kan. 294, 309, 937 P.2d 1, 11 (1997). The state legislature has entrusted this responsibility to the KCC. Under its statutory mandate, the KCC must establish "just and reasonable rates" that are both fair to the public and permit public utilities to provide sufficient service while maintaining a reasonable return on their investment. K.S.A. 66–101b (Supp.1996); K.A.R. 82–1–231(a) (1997). In calculating the "just and reasonable rates," the KCC considers a wide array of factors including the utility's infrastructure costs, financial capital sources, foreseeable operating expenditures, and projected customer base.[7] *See generally* K.A.R. 82–1–231(c).

 Subject to a handful of exceptions not applicable here, a public utility is strictly bound to the rate schedule erected by the KCC. *Sunflower Pipeline Co. v. State Corp. Comm'n*, 5 Kan.App.2d 715, 718, 624 P.2d 466, 469–70 (1981) (citing K.S.A. 66–109). If, under these established rates, a public utility finds that it has incurred a revenue surplus or shortage, it is neither obligated to refund the surplus nor permitted to recoup the shortage through a rate alteration. *Id.* at 718–19 & 722, 624 P.2d at 470 & 472. The theory behind this rule is that a deviation from KCC–approved rates would amount to retroactive rate-making. *Kansas*

*Gas & Elec. Co. v. State Corp. Comm'n*, 14 Kan.App.2d 527, 532–33, 794 P.2d 1165, 1170 (1990).

 Retroactive ratemaking ordinarily occurs when a "utility is required to refund revenues collected, pursuant to the then lawfully established rates, for such past use." *Kansas Pipeline Partnership v. State Corp. Com'n*, 24 Kan.App.2d 42, 57, 941 P.2d 390, 400 (1997) (citation omitted). The same principles are involved, however, when a utility raises its rates without prior approval of the state regulatory agency. In Kansas, the ban on retroactive ratemaking has both a statutory and constitutional basis. K.S.A. 66–109 prohibits departures from KCC-established rates even if such rates are unreasonably low. *See Sunflower Pipeline Co.*, 5 Kan. App.2d at 718–19, 624 P.2d at 469–70. A rate fluctuation also implicates due process concerns by infringing on certain vested rights. As the Kansas Supreme Court noted:

> [W]hen a rate has been the subject of a deliberate inquiry in which the carriers, the shippers and the commission's own experts have participated, ... any rate so prescribed by the commission and put into effect by the carriers may be confidently collected and retained by them ..., without misgiving that at some future time a further hearing of the commission may be had and more evidence taken and a different conclusion reached, and those rates condemned as unreasonable .... Such a method of regulating public utilities has none of the earmarks of due process of law nor the simplest notions of justice.

*Kansas Gas & Elec. Co.*, 14 Kan.App.2d at 533, 794 P.2d at 1170 (quoting *State ex rel. Boynton v. Public Serv. Comm'n*, 135 Kan. 491, 504, 11 P.2d 999, 1006–07 (1932)).

 In the long-run, the prohibition on retroactive ratemaking is more about process than substance. The KCC's primary objec-

---

7. Defendants have injected a certain degree of confusion into their pleadings by using the terms "rate" and "tariff" interchangeably. Although the terms share common characteristics, they are not identical. A rate schedule involves KCC-approved natural gas prices that allow a utility to recover the revenue to which it is entitled. *Kansas Gas & Elec. Co. v. State Corp. Comm'n*, 14

Kan.App.2d 527, 534, 794 P.2d 1165, 1171 (1990). A tariff is broader than a rate schedule and encompasses all the terms and conditions that govern the relationship between the utility and its customers. *Id.; see also Grindsted Prods., Inc. v. Kansas Corp. Com'n*, 262 Kan. 294, 309, 937 P.2d 1, 11 (1997).

tive, after all, is to maintain a delicate equilibrium under which the public is subjected to reasonable rates while utilities receive a fair return on their investments. To ensure this balance, the KCC takes into account a utility's prior revenue surplus or shortage when setting "just and reasonable" rate schedules for the future. In other words, the KCC adjusts rates as necessary, but does so on a prospective rather than retrospective basis. *See id.* at 532, 794 P.2d at 1170. Thus, a utility facing net losses must apply to the KCC for a rate increase. *Sunflower Pipeline Co.*, 5 Kan.App.2d at 719, 624 P.2d at 470. Similarly, a utility confronting excess revenues must reduce its requested return on investment by the amount of the surplus in its subsequent rate application.

▇▇▇ Turning to the facts of the case at bar, both parties agree that the KCC, in calculating plaintiff's approved rates in 1991 and 1995, included the overhead costs necessary for plaintiff to serve Grindsted Products and Dazey Corporation. The parties also agree that the KCC did not include in its rate approval any costs associated with plaintiff extending its pipelines to Superior Asphalt's plant. Finally, plaintiff acknowledges that it earned the reasonable rate of return on its investment that the KCC had approved in its rate applications. Contrary to defendants' suggestion, however, plaintiff's full return on investment does not preclude a recovery here.

No statute or regulation in this state prevents a public utility from earning revenue between rate applications that the KCC did not anticipate the utility would earn when originally setting the rate schedule. As noted above, the only restriction on such excess revenues is that the utility must reduce its requested return on investment by the amount of the surplus in its next rate application. Even with the obligatory rate reduction, however, the aggrieved utility comes out ahead in terms of the time value of money (i.e., the right to use and/or invest the dam-

ages between the time of recovery and the next rate hearing).

Under defendants' theory, no entity violating the regulations governing public utilities would ever be exposed to liability. Companies like Brock could freely sell natural gas without a certificate of convenience and necessity and face no financial repercussions. The Kansas legislature did not intend to confer such a windfall upon renegade public utilities. Moreover, defendants' position would force plaintiff's customers to subsidize Brock's wrongful conduct. Indeed, if Brock bears no responsibility for damages that plaintiff is able to establish, plaintiff's customers will receive no correlative rate reduction at a subsequent rate hearing. In sum, the court finds defendants' retroactive rate-making defense inconsistent with the objectives of the statutory scheme governing public utilities in Kansas.

#### c. Brock's Conduct Subsequent to July 1996 KCC Order

As discussed in Part I, after the KCC issued its ruling in July 1996, Brock undertook a number of actions in an attempt to alter its illegal distribution system. Plaintiff later filed a complaint with the KCC arguing that Brock's new infrastructure continues to contravene public utility statutory requirements and violate plaintiff's rights. That matter remains pending before the KCC. Because the court has no authority to reach the merits of the regulatory matters on the KCC's docket, the court will restrict the subject matter of this dispute to events occurring prior to April 20, 1997, the date on which Brock began to implement its new distribution system.[8]

### 3. Prejudgment Interest

▇▇▇ Inextricably intertwined with plaintiff's liability theory is its claim for prejudgment interest. In general, Kansas law authorizes prejudgment interest only on liquidated claims. *Green Constr. Co. v. Kansas*

---

**8.** Brock avers that because it could have made the changes to its distribution system prior to March 1997, plaintiff must prove that Brock would not have restructured its operations had it known it was acting as a public utility. The court rejects this argument. First, the KCC has

not determined whether Brock's current operations are lawful. Second, Brock's apparent ignorance or misinterpretation of certain Kansas public utility statutes does not justify its prior illegal conduct.

*Power & Light Co.,* 1 F.3d 1005, 1010 (10th Cir.1993) (citing K.S.A. 16–201). "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation." *Kilner v. State Farm Mut. Auto. Ins. Co.,* 252 Kan. 675, 686–87, 847 P.2d 1292, 1300 (1993). The fact that a defendant's underlying liability is in dispute is irrelevant to the issue of prejudgment interest as long as the amount of damages is certain. *Crawford v. Prudential Ins. Co.,* 245 Kan. 724, 737, 783 P.2d 900, 909 (1989).

■ Plaintiff argues that because the amount of natural gas Brock sold to its customers in the Johnson County industrial airport area is undisputed, plaintiff's damages can be calculated simply by multiplying the volume of natural gas sold by the KCC-approved tariff rate. The court disagrees. Even if Brock's customers would have purchased natural gas from plaintiff had Brock been absent from the market, there is a strong possibility that those customers would not have paid plaintiff's then-existing rates.

Plaintiff maintains that price reductions may not be considered in the damages analysis because: (1) any reduction would be purely speculative; (2) plaintiff offered reduced rates only to companies which, unlike Brock's customers, had legal bypass alternatives, and (3) plaintiff never actually discounted its natural gas delivery rates. None of these arguments are persuasive. First, if the jury finds defendants liable and opts to use a reduced transportation rate in calculating plaintiff's damages, it will not be acting in a vacuum. There presumably will be evidence in the record reflecting the rates of Williams Natural Gas Company and alternative fuel providers from which the jury can make a just a reasonable estimate of damages. *See Olathe Mfg., Inc. v. Browning Mfg.,* 259 Kan. 735, 762–68, 915 P.2d 86, 103–06 (1996) (although lost profits need not be computed with mathematical precision, any award must be based on a rational standard and accurate data). If plaintiff tenders nothing more than specula-

tion to support its lost profits request, recovery will be denied altogether.

Second, plaintiff's claim that Brock's industrial customers would not have qualified for a rate discount undermines plaintiff's prior argument that its contract negotiations with those companies would have been different had Brock not been in the picture. Either plaintiff would have agreed to a reduction in rates commensurate to those charged by Williams Natural Gas Company and alternative fuel source providers or it would have made no sales to Brock's customers.[9] Any damages plaintiff incurred are unliquidated.

Citing *Lightcap v. Mobil Oil Corp.,* 221 Kan. 448, 562 P.2d 1 (1977), plaintiff next argues that even if its damages are unliquidated, it is entitled to prejudgment interest. In *Lightcap,* the Kansas Supreme Court carved out a narrow exception to the rule authorizing prejudgment interest exclusively in cases involving liquidated damages. The court there said that a trial judge has discretion to award prejudgment interest on an unliquidated claim if such an award is necessary to afford full compensation to the recovering party. *Id.* at 468, 562 P.2d at 16. Plaintiff has articulated no reason why prejudgment interest is necessary here. As the court noted earlier, any damages plaintiff secures will have to be offset in its next rate application with the KCC. A prejudgment interest award, therefore, would have a limited effect in the context of making plaintiff whole. Accordingly, the court will not permit plaintiff to recover prejudgment interest if it prevails at trial.

*C. Brock's Affirmative Defenses*

■ Invoking *Kansas–Nebraska Natural Gas Co. v. State Corp. Comm'n,* 176 Kan. 561, 271 P.2d 1091 (1954), plaintiff insists that defendants are precluded from raising their affirmative defenses of laches, estoppel, and waiver in this litigation. Plaintiff contends that Brock asserted each of these defenses in hearings before the KCC and may not collaterally attack the KCC's implicit re-

---

**9.** It is, of course, theoretically possible that some intangible factor may have motivated Brock's customers to pay a premium price to have their natural gas delivered through plaintiff's facilities. The highly fungible nature of natural gas, howev-

er, makes such a scenario fairly remote. Moreover, plaintiff has not articulated any such theory and the court will not speculate as to possible consumer proclivities.

jection of those defenses in this action.[10] Plaintiff also maintains that Brock's unclean hands require the court to strike defendants' equitable defenses.

### 1. Jurisdictional Bar

■ In *Kansas–Nebraska Natural Gas Co.*, the Kansas Supreme Court held that a party wishing to challenge the validity of any part of a KCC Order on legal or equitable grounds must raise the arguments either before the Commission itself or before a state court on direct review of the Commission's Order. *Id.* at 569–70, 271 P.2d at 1097–98. No other tribunal has jurisdiction to entertain attacks on the KCC's rulings. *Id.* The supreme court echoed that conclusion in *Pelican Transfer & Storage, Inc. v. Kansas Corp. Com'n,* 195 Kan. 76, 402 P.2d 762 (1965). Those cases, however, are not relevant to the instant action. Defendants are not disputing any of the KCC's findings here. They are raising various defenses to plaintiff's request for damages. Plaintiff's suggestion that Brock asserted these defenses at the KCC hearing is rejected. Plaintiff includes witness statements and administrative pleadings in support of its partial summary judgment motion. Those materials, however, are largely out of context to the present action. They do not satisfy the court that Brock raised the equitable issues before the KCC.

### 2. Unclean Hands

■ Plaintiff further argues that Brock knew or should have known that the KCC bypass policy mandated all natural gas within plaintiff's certificated service area to be delivered through plaintiff's local distribution facilities. Plaintiff contends that Brock's disregard of this policy deprives it of the opportunity to assert any equitable defenses in this proceeding.

The clean hands doctrine is based on an equitable principle that one who seeks equity must do so with clean hands. *T.S.I. Holdings, Inc. v. Jenkins,* 260 Kan. 703, 720, 924 P.2d 1239, 1250 (1996). This maxim is designed to prevent a litigant from obtaining affirmative relief in equity with respect to transactions in which it has been guilty of inequitable conduct. *Id.* Courts are not bound to invoke this doctrine, but may do so within their sound discretion. *Id.* The discretion results from the fact that the doctrine is not actually a defense, but a concept designed to protect the court from becoming a party to the transgressor's misconduct. *Green v. Higgins,* 217 Kan. 217, 221, 535 P.2d 446, 449 (1975) (citing *Gaudiosi v. Mellon,* 269 F.2d 873, 882 (3d Cir.1959)).

■ The court does not believe defendants should be precluded from raising equitable defenses pursuant to an unclean hands theory. Brock delivered natural gas to its customers in plaintiff's certificated service area under the mistaken belief that it operated outside the regulatory jurisdiction of the KCC. Although the KCC determined, in a thorough written Order, that Brock's activities constituted the work of a public utility, thereby subjecting the company to the KCC's bypass policy, there is nothing in the record that convinces the court Brock intended to defraud plaintiff or to act in open defiance of established KCC policy. In sum, the court, in its discretion, declines to invoke the unclean hands doctrine in this lawsuit.[11]

---

**10.** Defendants incorrectly suggest that their equitable defenses present pure questions of fact for the jury. In fact, such defenses are mixed questions of fact and law. *See White v. Conoco, Inc.,* 710 F.2d 1442, 1446–47 (10th Cir.1983) (laches); *Patrons Mut. Ins. Ass'n v. Union Gas Sys., Inc.,* 250 Kan. 722, 725, 830 P.2d 35, 39 (1992) (waiver); *Safeway Stores, Inc. v. Wilson,* 190 Kan. 7, 11, 372 P.2d 551, 554 (1962) (estoppel). While the court may submit special interrogatories to the jury to resolve factual disputes, the ultimate determination regarding the applicability of the equitable defenses rests within the exclusive province of the court.

**11.** Contrary to defendants' argument, the unclean hands doctrine, in certain situations, may prevent a defendant from raising its equitable affirmative defenses. If the plaintiff has unclean hands and seeks equitable relief, the defendant's own improper behavior serves as no bar to its equitable defenses. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). If, on the other hand, the plaintiff has no unclean hands or requests exclusively legal relief, the defendant's unclean hands may preclude it from advancing equitable defenses. The rationale for this rule is grounded in the historical demarcation between courts of law and courts of equity. Prior to the joinder of these two courts, an equitable defense interposed with a suit at law had to be raised initially in a court of equity and decided by the judge as a chancellor. *See Liberty Oil Co. v. Condon Nat'l Bank,* 260 U.S. 235, 242–43, 43 S.Ct. 118, 67 L.Ed. 232 (1922). Only if an

### 3. Application of Equitable Defenses

Although the court has jurisdiction to entertain Brock's equitable defenses, Brock's arguments are easily dismissed.

#### a. Equitable Estoppel

The doctrine of equitable estoppel has two fundamental elements: misrepresentation and detrimental reliance. *Cosgrove v. Young,* 230 Kan. 705, 718, 642 P.2d 75, 85 (1982). In describing the doctrine, the Kansas Supreme Court has observed:

> Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.

*Id.* at 705 ¶ 6, 642 P.2d at 76.

Defendants contend that the 1987 contract between plaintiff's predecessor—Union Gas, and Williams Production Company shows that plaintiff was aware Williams was selling natural gas to Dazey Corporation without going through plaintiff's local distribution facilities. Defendants apparently claim that this knowledge should estop plaintiff from seeking damages arising out of Brock's sales to Dazey or any other customer in the Johnson County Industrial Airport area. The court rejects this argument. The only competent evidence in the record suggests that Union Gas agreed to Williams' sales because Union Gas believed Williams' customers had the right to bypass local distribution facilities under various KCC-recognized exceptions. Even if Union Gas realized that Williams' conduct was illegal, there was no intent to mislead Brock. *See id.* at 718, 642 P.2d at 85 (failure to show active misrepresentation or concealment undermines estoppel defenses). Further, defendants have not satisfied the court that Brock changed its position at any point in reliance

upon Union Gas' conduct. *See Bowen v. Westerhaus,* 224 Kan. 42, 46, 578 P.2d 1102, 1105 (1978) ("One who asserts an estoppel must show some change in position in reliance on the adversary's misleading statement.") (citation omitted). The court, therefore, declines to invoke the estoppel doctrine in this case.

#### b. Waiver

Ordinarily invoked in contract law, the concept of waiver implies that "a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with [a] contractual right." *Schraft v. Leis,* 236 Kan. 28, 37, 686 P.2d 865, 873 (1984). Although waiver is consensual in nature, a party's intention may be inferred from its conduct and the requisite knowledge may be actual or constructive. *Id.* (citing *Stratmann v. Stratmann,* 6 Kan.App.2d 403, 410–11, 628 P.2d 1080, 1087 (1981)). Once it has been established that a right has been waived, the party possessing the right is precluded from later asserting it in a court of law. *Stratmann,* 6 Kan.App.2d at 410, 628 P.2d at 1086–87 (citing *United Am. State Bank & Trust Co. v. Wild W. Chrysler Plymouth, Inc.,* 221 Kan. 523, 526–27, 561 P.2d 792, 795 (1977)).

Defendants support their waiver argument by pointing to the clause in the 1987 Union Gas–Williams Production Company contract in which Williams specifically reserved the right to sell natural gas to Dazey Corporation. Similar to their estoppel theory, defendants suggest that by not objecting to such sales, Union Gas (and plaintiff, as Union Gas' successor) waived its right to challenge all future sales by public utilities not utilizing Union Gas' local distribution facilities. The court disagrees. Even assuming, through the exercise of due diligence, plaintiff could have discovered that Williams' sales and delivery methods contravened KCC regulations, plaintiff's damages claim would not be vulnerable to a waiver defense. Defendants' argument is predicated on an erroneous assumption that plaintiff had the right

issue of law remained after the chancellor's resolution of the equitable defense could the legal

matters in the case be sent to a jury in the court of law. *Id.* 260 U.S. at 242.

to contractually waive the enforcement of a KCC statute or regulation. The KCC has the exclusive authority to enforce its governing provisions; individuals may not divest the Commission of jurisdiction by written agreement. Moreover, as plaintiff correctly points out, the doctrines of waiver and estoppel generally do not apply to transactions that are forbidden by statute or are contrary to public policy. *See American Sur. Co. v. Gold,* 375 F.2d 523, 528 (10th Cir.1966). Accordingly, the court finds Brock's waiver defense inapplicable to the instant action.

### c. Laches

Brock's final equitable defense is grounded in the doctrine of laches. This doctrine is an equitable device designed to bar stale claims. The Kansas Supreme Court has held:

> [C]ourts of equity will regard long passage of time in asserting claims with disfavor apart from any particular statute of limitations.... Delay, by itself, [however,] does not constitute laches and an action generally will not be defeated by laches alone unless some prejudice has resulted .therefrom to the rights or interests of the adverse party.

*Cosgrove,* 230 Kan. at 719, 642 P.2d at 86 (citations omitted). In assessing the applicability of this defense, the court must consider the totality of circumstances surrounding the filing of the lawsuit. *Gillespie v. Seymour,* 250 Kan. 123, 134, 823 .P.2d 782, 792 (1991). Upon careful consideration, the court finds that defendants have demonstrated no undue prejudice here.

The court acknowledges that in its previous Memorandum and Order, it held that plaintiff's damages could be detected easily through the exercise of reasonable diligence. *United Cities Gas Co. v. Brock Exploration Co.,* 984 F.Supp. 1379, 1388 (D.Kan.1997). The court also concedes that a party's mere ignorance of relevant facts does not vitiate an otherwise valid laches defense if the pertinent information could have been ascertained through such diligence. *Malone v. Young,* 148 Kan. 250, 263, 81 P.2d 23, 31 (1938). Nevertheless, plaintiff's dilatory pursuit of its legal rights has not unduly prejudiced the defendants.

Because laches is an equitable defense, its application is controlled by equitable considerations and it cannot be used to defeat justice. *Shell v. Strong,* 151 F.2d 909, 911 (10th Cir.1945) (applying Kansas law). In this vein, courts confronting equitable defenses often apply the statutory limitation period rather than invoking the doctrine of laches. *See Jennings v. Jennings,* 211 Kan. 515, 524 507 P.2d 241, 251 (1973). In the case at bar, the court has minimized any prejudice to defendants by limiting plaintiff's recovery to natural gas sales within the three-year statute of limitations (i.e., sales occurring on or after September 26, 1992). *See United Cities Gas Co.,* 984 F.Supp. at 1389. Defendants have effectively received a windfall for all sales prior to that date.

Defendants maintain that had Brock learned of the illegality of its conduct prior to the commencement of KCC proceedings, it immediately would have altered its operations and incurred no liability exposure. The court rejects this argument. Even after the KCC ruled that Brock's natural gas sales violated Commission regulations, Brock delayed more than nine months before implementing any changes to its distribution system. Moreover, the legality of that new distribution system remains in dispute. In sum, the court believes that the time limitation on plaintiff's damages adequately protects defendants from any inequitable injury or prejudice resulting from plaintiff's delay in filing suit.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiff's motion for partial summary judgment (Doc. 43) and defendant's motion for summary judgment (Doc. 47) are each granted in part and denied in part. Specifically, the court orders that: (1) plaintiff may maintain a cause of action under K.S.A. 66–176; (2) genuine issues of material fact remain with respect to the causation and amount of plaintiff's damages; (3) plaintiff has no right to prejudgment interest; and (4) defendants are precluded from raising their equitable defenses.

IT IS FURTHER ORDERED that plaintiff's motion to strike (Doc. 60) defendants'

reply memorandum is denied pursuant to Fed.R.Civ.P. 6(a & e).

**IT IS SO ORDERED.**