**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0342n.06
Filed: May 15, 2009

No. 08-1010

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RICHARD GREENWOOD, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| KENNETH RAZNICK, | ) | |
| | ) | |
| **Defendant-Appellee.** | ) | **O P I N I O N** |
| | ) | |

Before:  MOORE and WHITE, Circuit Judges; and VINSON,[*] District Judge.

**C. ROGER VINSON, District Judge.** Richard Greenwood filed this diversity action against

Kenneth Raznick, alleging breach of an employment contract. Upon cross motions, the district court

denied summary judgment for Greenwood and granted summary judgment for Raznick. Greenwood

now appeals. Because there are genuine issues of material fact, we REVERSE the grant of summary

judgment in favor of Raznick and REMAND for proceedings consistent with this opinion.

### I. BACKGROUND

**A. Facts**

---

[*] The Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

The facts of this case are hotly disputed. Because this appeal involves the grant of summary judgment in favor of Raznick, we must detail the facts in the light most favorable to Greenwood and draw all reasonable inferences in his favor.

In or about October 2001, Raznick, an entrepreneur, began discussions with Greenwood, a bank chief executive officer ("CEO"), about a business venture specializing in internet-based web phones, a technology in which Raznick was investing money. Raznick assured Greenwood that he (Raznick) had the means and willingness to fund the new venture. Consequently, Greenwood agreed to enter into Raznick's employ. The parties originally had a verbal agreement, but, at Greenwood's insistence, Raznick agreed to put the contract in writing. The two men signed the agreement below a statement that read: "Initial Agreed subject to final revisions." The written agreement provided that Greenwood would receive an annual compensation of $420,000, which was the level of his previous salary as a bank CEO.[1]

Over the next three years, Greenwood was paid only a small portion of the salary that was called for under the contract. Specifically, he was paid $190,000 over those several years, leaving a balance due of over $1,000,000. Greenwood claims that he continued to work for Raznick (even

---

[1] Raznick denies that he entered into a contract with Greenwood. He claims that he only signed the document because Greenwood said he needed to show his wife something in writing so that she would accept his decision to leave his job and pursue the web phone venture. Raznick thus claims that he never intended to be bound by the terms of the "purported contract," and he maintains that Greenwood knew he did not intend to be bound. According to Raznick, that is why he wrote "Initial Agreed subject to final revisions" above the signature lines. Nevertheless, for purposes of Raznick's motion, the district court was required on summary judgment (and we are required in this appeal) to accept that the parties intended to, and did, enter into a binding employment contract.

though he was being underpaid) because Raznick told him that his assets were temporarily illiquid and that he would pay what was owed when he had liquidity.

In addition to Raznick's failure to pay Greenwood his full salary, Raznick also failed to properly fund the web phone venture. Raznick and Greenwood initially pursued the venture through an entity known as conneXcenter, but that entity failed in 2003 because of financial problems. Raznick and Greenwood later formed cXc Services, Inc. The corporation's organizational documents were filed and that company name was used as a "d/b/a" beginning in the spring of 2003, but shares were not issued in the corporation at that time. Greenwood was president and CEO of cXc. In 2004, faced with financial problems due to Raznick's failure to fund the business, cXc decided to "reverse merge" with a publicly-traded corporation, BICO, Inc. The idea was that the cXc board of directors ("the Board"), which included Greenwood, would issue shares in cXc to various people associated with the company, and the shareholders would then immediately exchange their cXc shares for BICO shares at the end of the reverse merger.

John Hannesson was cXc's attorney and corporate secretary when the Board decided to issue the shares and reverse merge with BICO. He testified during his deposition that cXc could issue shares only on terms that had been approved by the Board; that is, before the shares could be issued "[t]here needed to be an appropriate corporate action authorizing it." However, he further explained that it was not necessary that the corporate action be reduced to writing and recorded in order to be effective. Although he could not specifically recall, he "believe[d]" that at some point the Board had authorized cXc to issue the stock pursuant to a "subscription agreement," which is a document that

defined the terms under which the shares would be issued. Different subscription agreements were used to issue shares to three classes of shareholders who were acquiring the stock on different terms. As pertinent here, the agreement designated for management contained a broadly worded release of any and all claims against Raznick. It stated in relevant part that the subscriber:

> ***hereby knowingly and voluntarily, fully releases,*** waives and forever discharges the Company, including the Company's affiliated, subsidiary, parent or related companies and all of their respective officers, directors, members, managers, shareholders, agents and employees, including, but not limited to **Kenneth Raznick,** (collectively referred to solely as the "Released Parties") ***from any and all claims, actions, causes of action, demands, damages (punitive, consequential or otherwise), judgments, executions, costs, expenses, attorney fees and liabilities of every kind and nature, whether at law or in equity, occurring before the date of this Agreement*** with respect to any aspect of the Subscription or the Subscriber's ownership of stock in the Company, or its affiliated successor, subsidiary, parent or related companies, ***or with respect to some other matter whether known or unknown, and/or whether direct or contingent, which the Subscriber now has or may ever have against the Released Parties.***

Greenwood testified that he was not comfortable with the release because of the significant money that he was owed in back salary, so he refused to sign the subscription agreement, and he repeatedly told Raznick --- before and after the merger --- that he would not agree to the terms of the release. However, at some point he signed the agreement "in anticipation" that Raznick would either (i) pay him the money that he was owed, or (ii) give written assurance that he would be paid at some point in the future. Greenwood said that he gave the signed agreement to Hannesson under these two conditions. When it subsequently became apparent that Raznick was not going to pay the back salary

4

or commit to doing so in writing, Greenwood asked for and received the signed document back from Hannesson, who never delivered it to Raznick.

Even though Greenwood did not formally execute and agree to the terms of the subscription agreement, he nevertheless received his cXc shares, which were immediately exchanged for BICO shares. As discussed *infra*, the parties dispute how Greenwood was able to get his shares without first signing the subscription agreement. Raznick maintains that the subscription agreement was the only means by which Greenwood could have obtained his shares, and that by obtaining the shares in the absence of a signature, he must have done one of two things: he issued the stock to himself (which he denies), or he allowed Hannesson to issue the shares to him while Hannesson was under the mistaken impression that Greenwood had signed or would be signing. Greenwood contends, however, that the subscription agreement was not the only means by which he (and others) obtained the stock. Rather, he maintains that the shares were issued to him as part of his compensation for serving as the CEO of BICO and that "[m]any people" received their shares without paying for them under the subscription agreement. As the record now exists in this case, it is impossible to ascertain how Greenwood obtained his cXc/BICO stock.

Shortly after the merger, it became apparent that BICO would not be the solution that everyone had hoped for. In 2005, a dispute arose between Raznick and various BICO shareholders. These shareholders accused Raznick of, among other things, failing to adequately fund BICO as he had promised. Raznick exited the company, and this litigation followed.

**B. Procedural History**

Greenwood filed a three-count complaint against Raznick, alleging (1) breach of contract; (2) fraud/fraudulent inducement/silent fraud; and (3) quantum meruit/unjust enrichment. The parties eventually filed cross motions for summary judgment. Raznick essentially based his motion on the following syllogism: because the issuance and distribution of cXc stock was authorized only under the subscription agreement (which contained the release), and because Greenwood received the cXc stock, it necessarily follows therefrom that he is bound by the release. Raznick referred to this as the "commanding principle" that no person may accept the benefits of an agreement, but then disclaim its burdens. Greenwood filed an affidavit in opposition to Raznick's motion and averred that he did not receive the cXc shares pursuant to the subscription agreement. Instead, as previously noted, he claimed that he received the stock as partial compensation to serve as CEO of BICO. He further stated that the Board never held a formal meeting to decide how and to whom the stock would be issued, and he claimed that other individuals received their shares without signing the subscription agreement.

The district judge held a hearing on the motions for summary judgment, after which he ruled from the bench:

> . . . I don't think I've ever seen a release any broader than this release. So then the question comes down to, given the fact that it requires a signature, does that mean in any and all circumstances it cannot be effective as a release.
>
> * * *
>
> Mr. Greenwood had a choice. He apparently recognized the release was very broad and he didn't want to sign it, but he can't then turn around and take the benefits, act --- his conduct belies his not

> accepting the release. His accepting the --- without accepting paper shares, but accepting shares in the corporation which entitled him to shares in the new corporation, are consistent with agreeing with the release or at least a conclusion that he cannot have it both ways.
>
> The fact that he may or may not have told the Defendant that he was not going to be bound by the release is superseded by the fact that his conduct actually was such that he took the benefit of the initial offering or the stock offering.
>
> Therefore, the Plaintiff's Motion for Summary Judgment to Strike the Defense of Release is denied, and the Defendant's Motion for Summary Judgment based on the release is granted.

The district court, therefore, based its ruling on one very narrow (and very disputed) issue: that Greenwood received his stock only pursuant to the subscription agreement. In the court's view, because Greenwood accepted the benefits of the subscription agreement (the stock), he also accepted the burdens (the release of Raznick). The court did not make any mention of the numerous disputed material facts, including Greenwood's claim in his sworn affidavit that no meeting was held to determine the share distribution, and his claim that the stock was issued as partial compensation for his serving as CEO of BICO and not as part of a subscription agreement.

Shortly thereafter, but before the district court reduced its oral ruling to a written order and judgment, Greenwood filed three supplemental briefs containing additional arguments. Several months later the district court entered a short order formalizing its summary judgment ruling and denying Greenwood's motion to consider the supplemental briefs. With respect to the former, the district court stated that it was granting Raznick's motion for summary judgment "[f]or the reasons stated on the record at the motion hearing." As for the latter, the court treated the additional

7

arguments as a motion for reconsideration and stated: "[A]ll questions of fact asserted by Plaintiff result from Plaintiff's own affidavit. 'After a motion for summary judgment has been made, a party may not create a factual issue by filing an affidavit that contradicts her earlier deposition testimony.'" (Citations omitted). However, the district court did not elaborate or explain what statements in Greenwood's affidavit the court felt contradicted his earlier deposition testimony. It is from this order that Greenwood now appeals.

## II. STANDARD OF REVIEW

This court will "review de novo a district court's order granting summary judgment," and, in doing so, will "view all evidence in the light most favorable to the nonmoving party." *Zomba Enterprises, Inc. v. Panorama Records, Inc.,* 491 F.3d 574, 581 (6th Cir. 2007). The ultimate question is whether "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III. DISCUSSION

The district court held that Greenwood was bound by the release language in the applicable subscription agreement, even though he never provided the company with an executed agreement because of the release provision. As a general matter, we do not necessarily disagree with the court's conclusion that *if* Greenwood, as a sophisticated businessman, accepted stock to which he knew he was entitled only pursuant to the subscription agreement, then he can be bound by what the agreement sets out. However, after viewing the record evidence in the light most favorable to

Greenwood, and drawing all reasonable inferences in his favor, we believe that there are gaps in the record and genuine disputed issues of material fact. For example, there is no clear corporate documentation that establishes how and in what way Greenwood became a shareholder of BICO. There is a document that purports to memorialize the "minutes" of the board meeting during which it was allegedly decided that the cXc shares would be distributed via the subscription agreement, but this document --- with the signature lines left blank --- was apparently never considered or executed by the Board. There is a real doubt as to whether the meeting even occurred. Greenwood, as noted, contends by affidavit that "[t]he company never had a formal meeting to decide to whom the shares would be distributed," and Hannesson testified that board minutes were sometimes prepared after a meeting or were sometimes prepared in anticipation of a meeting, but he was unable to recall if the meeting was actually held.[2]

Even if we were to assume that the meeting was held, and that the subscription agreements were properly authorized at that meeting, it does not necessarily follow that Greenwood obtained his shares only after accepting the subscription agreement and the release. Indeed, Hannesson testified that stock could be issued in a number of ways as long as there was "appropriate corporate action" and, further, that the action did not have to be reduced to writing in order to be effective. Raznick suggests in his brief, however, that "in a critical portion of his testimony, Hannesson confirmed that the cXc Services Board authorized the company to issue shares pursuant to [the] subscription

---

[2] Counsel for Raznick conceded during oral argument that "I don't believe there was a board meeting."

agreement and through no other means." *See* Brief of Appellee at 7; *id.* at 7 n.1 (asserting that during

his deposition Hannesson "clearly explained that cXc Services *only* issued shares pursuant to the

board-approved subscription agreement") (emphasis in the original). However, after reviewing the

record, Hannesson's testimony on this point is not as clear and unambiguous as Raznick suggests.

Indeed, there was much that he could not recall. While it is true that Hannesson testified that it was

"expected" that the cXc shares would be distributed pursuant to the subscription agreement, and that

shareholders were generally "supposed to complete the subscription agreement," he did not say that

the agreement was the *only* way to obtain the shares. *See, e.g.,* Joint Appendix at 87-88 (stating that

he could not "recall" if the Board had authorized the issuance of shares to individuals who did not

execute the subscription agreements); *cf. id.* at 100 (answering "I don't know . . . I think there are,"

when asked if there were people other than Greenwood who received BICO shares yet did not release

Raznick from liability). In fact, he testified elsewhere that subscription agreements are *not* the only

way that stock shares could be issued:

> Q. And is a subscription agreement the only way that shares can be issued to a shareholder or to a prospective shareholder?
>
> A. No.
>
> Q. What are some of the other mechanisms by which shares can be transferred to an individual?
>
> A. *They can be earned and issued as compensation*. They can simply be traded for other things of value without documentation. They can be acquired through stock options. Those are the ways that immediately come to mind. I'm sure there are others.

*Id.* at 99 (emphasis added). As noted several times now, Greenwood has filed a sworn affidavit in which he affirms that he was issued the stock as partial compensation for serving as CEO of BICO. Hannesson testified that he has no "recollection" of whether that is true. *See id.* at 101; *accord id.* at 99 (further stating that "I don't have much recollection of other circumstances" that might explain how Greenwood was able to obtain his shares without signing the subscription agreement). Because we are reviewing a grant of summary judgment, we must resolve this dispute in Greenwood's favor.[3]

Given the general uncertainty concerning how the cXc shares were issued and exchanged into BICO shares, and, more specifically, how and under what circumstances the shares were issued to Greenwood, we cannot say as a matter of law that Greenwood is bound by the release contained in the subscription agreement. Insofar as there is a genuine disputed issue of material fact as to whether he received the stock under the terms of the subscription agreement (instead of through some other means), summary judgment was not appropriate on this record.[4]

---

[3] Raznick argues that the affidavit must be rejected as it allegedly contradicts Greenwood's earlier deposition testimony, and the district court apparently agreed. However, Greenwood did not testify that he had received his shares via the subscription agreement and not as compensation for serving as CEO of BICO. Instead, as his attorney explained during oral argument in this appeal, the issue of precisely how Greenwood received the stock was not fully explored by Raznick's attorney. Because his deposition is mostly silent about how he obtained his shares, his affidavit does not seem to be in conflict on this point.

[4] Although Greenwood focuses the vast majority of his attention and argument on whether the district court erred in granting summary judgment for Raznick, he has technically appealed the denial of his own motion for summary judgment on the release argument. For all the reasons stated, however, given the hotly disputed issues of material fact, summary judgment is also unavailable to him on this record.

We further observe that Greenwood argues that Raznick is barred from asserting the equitable defense of estoppel because Raznick has unclean hands.[5] The district court rejected this argument when it dismissed the arguments made in the supplemental briefs filed by Greenwood after the district court granted Raznick's motion for summary judgment. The district court did not specifically consider the unclean-hands argument in this order and simply stated that "all [Greenwood's] legal arguments were addressed during oral argument, or could have been." *Greenwood v. Raznick*, 2007 WL 3227586, at *1 (E.D. Mich. 2007). Greenwood raised his unclean-hands argument before the district court granted summary judgment, so it is not the case that this issue was raised only in a motion to reconsider. *See* Br. in Support of Greenwood's Opp. to Raznick's Mot. for Sum. J., Nov. 11, 2006, at 16-17.

Although unclean hands is a defense usually asserted by defendants against plaintiffs, Judge Posner of the Seventh Circuit has explained that "unclean hands can be asserted in opposition to an equitable defense as well as being assertible as a defense to a claim for equitable relief." *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1022 (7th Cir. 2002); *see also Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150-51 (5th Cir. 1985); *United Cities Gas Co. v. Brock Exploration Co.*, 995 F.Supp. 1284, 1296 n.1 (D. Kan. 1998). Because the district court did not explain its rejection of Greenwood's argument that the unclean-hands doctrine barred Raznick from raising equitable defenses to Greenwood's suit, we direct the court to consider this issue on remand as well.

---

[5] Although Raznick relies on the language of the agreement, the agreement was not signed, and therefore his effort to enforce the terms of the agreement relies on the equitable doctrine of estoppel, rather than the contractual agreement itself.

## IV. CONCLUSION

For the above-stated reasons, the decision by the district court is REVERSED and the case

is REMANDED for further proceedings consistent with this opinion.